UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                 :

HARRY CATTON, PHILLIP MARKS,        :
STEVEN KEVELSON, JOHN SCOTTO,     :
ERIK KAHN, ROBERT WISSENBACH,     :
and JOHN DOES 1-10,                     :
                                   :
                Plaintiffs,       :
                                   :
     - against -                     :
                                   :
DEFENSE TECHNOLOGY SYSTEMS, INC.,:
JOHN BRADY, EDWARD McPHEE,      :
DANIEL McPHEE, and PHILLIP RAUSCH, :
                                   :
               Defendants.       :
                                   :
-----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/3/06

**OPINION AND ORDER**

**05 Civ. 6954 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

Plaintiffs bring this case on behalf of certain purchasers of common

stock in Defense Technology Systems, Inc. ("the Company"), a company quoted in

the Pink Sheets.[1] The gravamen of plaintiffs' allegations is that defendants

---

[1]    According to the Securities and Exchange Commission, "[t]he Pink
Sheets does not require companies whose securities are quoted upon its systems to
meet any listing requirements. . . . [T]he companies quoted in the Pink Sheets tend
to be closely held, extremely small and/or thinly traded. Most do not meet the
minimum listing requirements for trading on a national securities exchange, such
as the New York Stock Exchange or the NASDAQ Stock Market." United States
Securities and Exchange Commission, "Pink Sheets,"

1

misrepresented the value of the Company in order to induce plaintiffs to purchase the Company's stock and to artificially inflate its price, and that defendants then sold their own shares at a substantial personal gain.

Plaintiffs allege violations of section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC").[2] Plaintiffs also allege common law fraud, breach of fiduciary duty, and negligent misrepresentation.[3] Two of the defendants, John Brady and Ed McPhee, now move to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6).[4] For the reasons explained below, defendants' motion is granted without prejudice.

## II.   BACKGROUND

The following allegations, drawn from plaintiffs' Complaint, are presumed to be true for purposes of this motion. In August 2003, defendant Dan McPhee entered into an agreement with Christopher Francis, one of the largest shareholders of the Company, whereby Ed McPhee and John Brady would

---

www.sec.gov/answers/pink.htm.

[2]   *See* 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10(b)(5).

[3]   *See* Amended Complaint ("Complaint") ¶¶ 73-93.

[4]   *See generally* Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("Def. Mem.").

purchase eight million shares of free trading stock owned by Francis.[5] That same

month, Brady and Ed McPhee contacted Brady's close friend John Scotto.[6] Brady

introduced Ed McPhee as an officer of the Company, and they informed Scotto

that Ed McPhee and Dan McPhee had made a deal to buy eight million shares of

the Company.[7] Brady and Ed McPhee said they were planning to retire the shares,

which would reduce the Company's outstanding shares to seventeen million.[8]

Both representations were false.[9]

Brady, Ed McPhee, and Dan McPhee also told Scotto that they were

changing the Company's business plan from a data distribution network to a

security company.[10] They said that the Company would be the sole designer,

manufacturer, and installer of ballistic glass and barriers in New York City.[11]

Despite these representations, "the Company had no infrastructure, expertise or

---

[5] *See* Complaint ¶ 21.

[6] *See id.* ¶¶ 22, 25.

[7] *See id.* ¶ 22.

[8] *See id.*

[9] *See id.* In fact, defendants had no plans to retire the shares, and the number of outstanding shares was approximately forty million. *See id.* ¶ 26.

[10] *See id.* ¶ 24.

[11] *See id.* ¶ 25.

plan to perform as defendants claimed."[12] Brady also represented that he was in control of the Company, and that the officers would do whatever he directed.[13]

Brady and Dan McPhee "publicly represented to plaintiffs" that the Company had two and a half million dollars in debt and twenty-five million shares of common stock outstanding, and that the founders of the Company were the holders of two thirds of the outstanding shares, which were restricted.[14] In fact, the Company had about forty million shares of common stock outstanding and more than eight million dollars in debt.[15] On numerous occasions, plaintiffs requested that Brady, Ed McPhee, and Dan McPhee provide them with financial documents regarding the Company.[16] In response, Brady admonished plaintiffs that they should trust him.[17] No documents were publicly available because the

---

[12]     *Id.* ¶ 19.

[13]     *See id.* ¶ 25.

[14]     *Id.* ¶ 26. "'Restricted' securities are securities acquired in an unregistered, private sale from an issuer or from an affiliate of the issuer. They typically bear a legend clearly stating that you may not resell them in the public marketplace unless the sale is exempt from the SEC's registration requirements." United States Securities and Exchange Commission, "'Restricted' Securities: Removing the Restrictive Legend," http://www.sec.gov/answers/restric.htm.

[15]     *See id.*

[16]     *See id.* ¶¶ 29, 32, 37, 47.

[17]     *See id.* ¶¶ 29, 47.

Company was late in its 10Q and 10K filings.[18]

Dan McPhee and Brady also made false public representations that Rudolph Giuliani was going to become part of the Board of Directors of the Company, and that the Company had just completed a security job for Fox Cable News for more than one million dollars.[19] In addition, Brady repeatedly stated that, once the Company was approved to be quoted on the OTC Bulletin Board,[20] he would bring in institutions that would purchase more than five million shares.[21] Brady and Ed McPhee represented that, once this happened, the stock value would increase to three dollars per share.[22] In fact, "defendants knew that the Company would not be fully reporting soon, that there was no reason to expect its stock value to rise to even $1.50 per share, and that there were no prestigious prospects

---

[18]     *See id.* ¶ 29.

[19]     *See id.* ¶ 27.

[20]     The OTC Bulletin Board ("OTCBB") has a rule that "require[s] companies whose securities [a]re quoted on the OTCBB to file updated financial reports with the SEC or with their banking or insurance regulators. If these companies fail[] to file current financial reports, their securities w[ill] be removed from the OTCBB, but c[an] be quoted in another system, such as the Pink Sheets." United States Securities and Exchange Commission, "OTC Bulletin Board (OTCBB) Eligibility Rule," http://www.sec.gov/answers/otcbbel.htm.

[21]     *See* Complaint ¶ 28.

[22]     *See id.* ¶ 35.

for the Board of Directors."[23]

On August 26, 2003, the Company began trading on the Pink Sheets.[24] During the following months, defendants Brady, Ed McPhee and Dan McPhee contacted the other plaintiffs and met with each of them personally.[25] For example, Scotto, who had purchased shares, introduced Brady to plaintiffs Harry Catton and Stephen Kevelson.[26] Brady again conveyed the aforementioned misinformation about the Company, urging them to purchase shares, which they did.[27] In the following months and in 2004, Dan McPhee and Brady repeatedly urged plaintiffs to continue buying stock, "and plaintiffs did so based on defendants' misrepresentations."[28]

On September 19, 2003, Brady invited Scotto to Fort Lauderdale, Florida, to meet with purported officers of the Company, Ed McPhee and Dan McPhee, and with John Porter, another investor.[29] Brady falsely stated to Scotto

---

[23]     *Id.*

[24]     *See id* ¶ 30.

[25]     *See id.* ¶ 33.

[26]     *See id.* ¶ 30.

[27]     *See id.*

[28]     *Id.* ¶ 48.

[29]     *See id.* ¶ 36.

6

that Porter was a friendly investor, interested in investing even further in the Company.[30] Porter actually had a preferred convertible position, also known as a "death spiral," which allows its holder to collect all assets of the Company in the event that the Company should file for bankruptcy.[31]

In early October, Ed McPhee, Dan McPhee, and Brady told Scotto that Giuliani was not going to be on the Board of Directors, a prospect that had been "entirely fabricated."[32] They asked Scotto to suggest possible Board candidates, and Scotto recommended Bernard Kerik, who had security expertise, and Donald DiRenzo, who had a real estate background.[33] On October 29, 2003, Kerik agreed to be an advisor to the Board, and Brady and Ed McPhee gave Kerik four hundred thousand shares of the Company's free trading stock.[34] During the course of defendants' negotiations with Kerik, the value of the Company's stock nearly doubled.[35]

On November 4, 2003, Scotto put Brady and Dan McPhee in contact

---

[30]   *See id.*

[31]   *Id.*

[32]   *Id.* ¶ 38.

[33]   *See id.*

[34]   *See id.* ¶ 42.

[35]   *See id.* ¶ 46.

with the other candidate for the Board, Donald DiRenzo, "because defendants believed doing so would further increase the value of the stock."[36] When DiRenzo requested to see the Company's financials before agreeing to be on the Board of Advisors, Dan McPhee said that they would be coming shortly and reiterated the aforementioned misinformation about the Company, including that there were only eight million shares "in the float."[37] On November 13, 2003, DiRenzo agreed to join the Board of Advisors, and Dan McPhee directed Brady and Ed McPhee to transfer two hundred thousand shares of unrestricted stock to DiRenzo.[38]

Between October 2003 and February 2004, Brady and Ed McPhee had advance notice of ten confidential Press Releases.[39] Dan McPhee would email these to his brother Ed before they were made public, and often called Ed to tell him of the Company's confidential matters.[40] Ed McPhee would then tell Brady, and defendants traded on this inside information.[41] When a press release was issued, an increase in trading of the Company's stock usually occurred in the hours

---

[36]   *Id.* ¶¶ 49-50.

[37]   *Id.* ¶ 50.

[38]   *See id.* ¶ 51.

[39]   *See id.* ¶ 52.

[40]   *See id.*

[41]   *See id.*

8

preceding the release.[42] "At the end of each day on which a press release was issued, the value of the Company's stock dropped from the time when trading opened that morning."[43]

This "veritable frenzy of trading" enabled defendants to "dump" their stock by selling their shares at artificially inflated prices, at a substantial profit to them and to the detriment of plaintiffs.[44] Based on their reliance on the above false representations by defendants, plaintiffs spent a total of approximately two and a half million dollars on shares in the Company, which was only an "empty shell."[45] As of October 14, 2005, when the Complaint was filed, the Company's stock was listed at five cents per share.[46]

## III. LEGAL STANDARD

### A. Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support

---

[42] *See id.* ¶ 53.

[43] *Id.*

[44] *Id.*

[45] *Id.* ¶ 59. *See also id.* ¶ 61.

[46] *See id.* ¶ 64.

9

of [its] claim which would entitle [it] to relief.'"[47] Generally, the task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."[48]

When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiff's favor.[49] Although the plaintiff's allegations are taken as true, the claim may still fail as a matter of law if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief, or if the claim is not legally feasible.[50]

## B.     Section 10(b) and Rule 10b-5 Securities Fraud Claim

To state a prima facie case of securities fraud under section 10(b) and

---

[47]     *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

[48]     *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir. 2004) (quotation marks and citation omitted).

[49]     *See Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 31 (2d Cir. 2004) (citation omitted).

[50]     *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, L.L.P.*, 322 F.3d 147, 158 (2d Cir. 2003); *Stamelman v. Fleishman-Hillard, Inc.*, No. 02 Civ. 8318, 2003 WL 21782645, at *2 (S.D.N.Y. July 31, 2003).

Rule 10b-5, a plaintiff must allege that "'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff.'"[51] Defendants do not challenge the adequacy of plaintiffs' pleadings that the alleged statements were false or that they were uttered with scienter.[52] Therefore, the central issues for the Court to consider with respect to the 10(b)(5) claim are whether the plaintiffs pleaded the alleged fraudulent conduct with sufficient particularity and whether they properly alleged reliance and proximate cause, which are commonly referred to as transaction causation and loss causation.

## 1. Particularity of the Facts Pleaded

Rule 10b-5 promulgated under the Exchange Act makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

---

[51] *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003) (quoting *Ganino v. Citizens Utils. Corp.*, 228 F.3d 154, 161 (2d Cir. 2000) (citing cases)).

[52] *See* Reply Memorandum of Law Submitted by Defendants Brady and Ed McPhee in Further Support of Their Motion to Dismiss the Amended Complaint ("Reply Mem.") at 5 n.5.

in connection with the purchase or sale of any security.[53]

Actions under all three subsections of Rule 10b-5 are subject to the pleading

requirements of Rule 9(b) rather than Rule 8(a) of the Federal Rules of Civil

Procedure,[54] because the heightened standard in Rule 9(b) applies to "all averments

of fraud."[55] Pleading standards for Rule 10b-5 claims became more complex after

the passage of the Private Securities Litigation Reform Act of 1995 ("PSLRA").[56]

Paragraph (b)(1) of the PSLRA promulgates a distinct pleading standard, which

applies only to

> any private action arising under this chapter [of the Exchange Act]
> in which the plaintiff alleges that the defendant –
> (A) made an untrue statement of a material fact; or
> (B) omitted to state a material fact necessary in order to make the
> statements made, in the light of the circumstances in which they

---

[53]    17 C.F.R. § 240.10b-5(a)-(c).

[54]    Rule 8(a) requires "(1) a short and plain statement of the grounds
upon which the court's jurisdiction depends . . . (2) a short and plain statement of
the claim showing that the pleader is entitled to relief, and (3) a demand for
judgment for the relief the pleader seeks."

[55]    Rule 9(b) provides that "[i]n all averments of fraud or mistake, the
circumstances concerning fraud and mistake shall be stated with particularity.
Malice, intent, knowledge and other condition of mind may be averred generally."
*See also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69-70 (2d Cir. 2001)
(applying the Rule 9(b) standard to securities fraud claims).

[56]    *See* Pub. L. No. 104-67, 109 Stat. 737 (1995). *See also Novak v.
Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).

were made, not misleading.[57]

In comparing this paragraph to the language of Rule 10b-5, it is apparent that "claims brought under Rule 10b-5(a) or 10b-5(c) need not [meet the pleading standard set forth in the PSLRA] if they do not rely upon misstatements or omissions (e.g., if they allege market manipulation)."[58]

To plead a market manipulation scheme, plaintiffs must satisfy Rule 9(b) by stating "the circumstances constituting fraud . . . with particularity."[59] To plead a material misrepresentation or omission under the heightened pleading requirements of the PSLRA, a complaint must

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed.[60]

It is unnecessary, however, for courts considering a material misrepresentation or omission claim to determine whether the pleading complies with Rule 9(b).

In deciding which of the two standards should apply, courts must

---

[57]     15 U.S.C. § 78u-4(b)(1).

[58]     *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d at 334.

[59]     Fed. R. Civ. Pro. 9(b).

[60]     15 U.S.C. § 78u-4(b)(1).

13

consider that manipulation is "virtually a term of art when used in connection with securities markets."[61] The term refers to practices that are intended to mislead investors by artificially affecting market activity, such as wash sales, matched orders, or rigged prices.[62] In its recent opinion in *Lentell v. Merrill Lynch*, the Second Circuit held that "where the sole basis for [market manipulation] claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c), and remain subject to the heightened pleading requirements of the PSLRA."[63]

### 2. Transaction Causation

To maintain a claim of securities fraud, a plaintiff must plead "transaction causation" – reliance on defendant's allegedly fraudulent conduct in buying or selling securities.[64] A rebuttable presumption of transaction causation may be established under the "fraud on the market" theory, even where a plaintiff was unaware of the fraudulent conduct at the time of the purchase or sale.[65] This

---

[61]     *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976).

[62]     *See Santa Fe Inds., Inc. v. Green*, 430 U.S. 462, 476 (1977).

[63]     *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177-78 (2d Cir. 2005).

[64]     *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 179 (2d Cir. 2001).

[65]     *Basic, Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

presumption arises because in an "'open and developed securities market . . .

[m]isleading statements will . . . defraud purchasers of stock even if the purchasers

do not directly rely on the misstatements.'"[66] Reliance may also be presumed in

cases based on omissions if a plaintiff can show that such omissions were

material.[67] Otherwise, transaction causation is properly pled by the allegation that

"but for the claimed misrepresentations or omissions, the plaintiff would not have

entered into the detrimental securities transaction."[68]

### 3. Loss Causation

A plaintiff must also allege "loss causation," which means that

defendant's conduct caused plaintiff's loss, at least in part.[69] A plaintiff cannot

---

[66]     *Id.* (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986)).
The presumption may be rebutted by showing the inapplicability of the fraud on
the market theory – for example, because the relevant securities market is not an
"efficient" market. *See, e.g., RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 185
F. Supp. 2d 389, 404 (S.D.N.Y. 2002); *In re Laser Arms Corp. Sec. Litig.*, 794 F.
Supp. 475, 490 (S.D.N.Y. 1989).

[67]     *See Castellano*, 257 F.3d at 186; *Press v. Chemical Inv. Servs. Corp.*,
166 F.3d 529, 539 (2d Cir. 1999). *See also In re Worldcom, Inc. Sec. Litig.*, 219
F.R.D. 267, 291 (S.D.N.Y. 2003) (citing *Affiliated Ute Citizens v. United States*,
406 U.S. 128, 153-54 (1972)).

[68]     *Lentell*, 396 F.3d at 172 (quoting *Emergent Capital Inv. Mgmt.*,
*L.L.C. v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).

[69]     *See Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716-17 (2d Cir.
1980) (Meskill, J., dissenting) (noting that "a fundamental principle of causation
which has long prevailed under the common law of fraud and which has been

simply allege that she purchased securities at artificially inflated prices.[70] The

Supreme Court recently noted in *Dura Pharmaceuticals, Inc. v. Broudo* that:

> [I]t should not prove burdensome for a plaintiff who has suffered
> an economic loss to provide a defendant with some indication of
> the loss and the causal connection that the plaintiff has in mind.
> At the same time, allowing a plaintiff to forgo giving any
> indication of the economic loss and proximate cause that the
> plaintiff has in mind would bring about harm of the very sort the
> statutes seek to avoid.[71]

The Second Circuit's opinion in *Lentell* post-dated *Dura* and reviewed some of this

Circuit's prior rulings concerning loss causation. The decision referred to several

possible standards for pleading loss causation, including "direct causation,"[72]

---

applied to comparable claims brought under the federal securities acts . . . is, quite
simply, that the injury averred must proceed directly from the wrong alleged and
must not be attributable to some supervening cause."). In 1995, Congress codified
the loss causation requirement in the PSLRA:

> In any private action arising under this chapter, the plaintiff shall
> have the burden of proving that the act or omission of the
> defendant alleged to violate this chapter caused the loss for which
> the plaintiff seeks to recover damages.

15 U.S.C. § 78u-4(b)(4).

[70]     *See Dura Pharms., Inc. v. Broudo,* 125 S. Ct. 1627, 1630 (2005).

[71]     *Id.* at 1634.

[72]     *Lentell,* 396 F.3d at 174 ("If that relationship [between 'the plaintiff's
investment loss and the information misstated'] is sufficiently direct, loss
causation is established. . . .").

16

"materialization of risk,"[73] and "corrective disclosure,"[74] all of which had been advanced over the course of prior case law in this Circuit.[75] The "common thread is that, in each situation, 'the loss be forseeable and [] the loss be caused by the materialization of the concealed risk.'"[76]

Thus, in a claim based on material misrepresentations and omissions, a plaintiff who cannot support an allegation of direct causation may do one of two things to sufficiently allege loss causation. "Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss," a plaintiff may plead that it is "the materialization of the undisclosed condition or event that causes the loss."[77] Alternatively, a plaintiff may identify particular "disclosing event[s]" that reveal the false information, and tie dissipation of artificial price inflation to those events.[78]

---

[73]     *Id.* at 173 (requiring "that the loss be caused by the materialization of the concealed risk").

[74]     *Id.* at 175 n.4 (finding that, because plaintiffs alleged no corrective disclosures, they could not establish loss causation).

[75]     *See In re Initial Public Offering Sec. Litig.*, No. 21 MC 92, 2005 WL 1529659, at *3-5 (S.D.N.Y. June 28, 2005).

[76]     *Id.* (quoting *Lentell*, 396 F.3d at 173 (emphasis omitted)).

[77]     *Id.* at *6.

[78]     *Id.*

17

## C. State Law Claims

### 1. Common Law Fraud

To recover damages for fraud under New York law, a plaintiff must prove: (1) a misrepresentation or a material omission of fact which was false and known to be false by defendant; (2) made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury.[79] "The claim also requires a showing of proximate causation, such that the injury 'is the natural and probable consequence of the defrauder's misrepresentation or . . . the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud.'"[80] A claim for common law fraud under New York law must also satisfy the requirements of Federal Rule of Civil Procedure 9(b), including the allegation of facts that give rise to a strong inference of fraudulent intent.[81]

### 2. Breach of Fiduciary Duty and Negligent Misrepresentation

---

[79] *See AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 208 (2d Cir. 2000).

[80] *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104-05 (2d Cir. 2001) (quoting *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1044 (2d Cir. 1986)).

[81] *See, e.g., Lewis v. Rosenfeld*, 138 F. Supp. 2d 466, 478 (S.D.N.Y. 2001).

The elements of a claim for breach of fiduciary duty under New York law are "breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages."[82] A claim of negligent misrepresentation must satisfy the following five elements: (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.[83]

## IV. DISCUSSION

### A. Particularity of the Facts Pleaded

Defendants argue that plaintiffs have failed to plead the allegedly fraudulent conduct with sufficient particularity to support a finding of securities fraud.[84] As discussed earlier, the level of particularity required depends on whether

---

[82]    *SCS Comme'ns., Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004).

[83]    *See Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

[84]    *See* Def. Mem. at 11-17.

plaintiffs alleged a market manipulation scheme or a misrepresentation claim.

## 1.    Market Manipulation Scheme

In order to achieve the benefit of the relaxed pleading standard that accompanies an allegation of market manipulation, plaintiffs try to frame their claims as part of a "pump and dump" scheme.[85] Plaintiffs' allegations about how defendants pumped up the stock value clearly revolve around material misrepresentations and omissions, but plaintiffs claim that misrepresentations were not the *sole* basis for their claim.[86] A brief discussion of the underlying distinction between market manipulation and misrepresentation claims is required in order to apply the principles of the Second Circuit's *Lentell* decision to this case.

Market manipulation cases are treated differently largely because the method of generating demand in the marketplace is secretive and difficult for an

---

[85]    These schemes "involve the touting of a company's stock . . . through false and misleading statements to the marketplace. After pumping the stock, fraudsters make huge profits by selling their cheap stock into the market." United States Securities and Exchange Commission, "Pump and Dump Schemes," www.sec.gov/answers/pumpdump.htm.

[86]    *See* Pl. Mem. at 9 ("Clearly, the Amended Complaint makes allegations under all three subsections of Rule 10b-5. . ."). *Cf. Lentell*, 396 F.3d at 177-78 ("where the *sole* basis for [market manipulation] claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c), and remain subject to the heightened pleading requirements of the PSLRA.") (emphasis added).

investor to detect.[87] For example, when wash sales are used to increase trading

volume and stimulate greater demand for a security, investors may be misled into

believing that the rest of the market has discovered some positive information, and

is purchasing shares to take advantage of that implicit "good news." Thus, while

misrepresentations affect investor beliefs by directly injecting false information

into the marketplace, market manipulation affects beliefs indirectly by creating

circumstantial evidence that positive information has entered the market. In

situations where secret manipulation indirectly affects investors' perceptions,

courts understand that it may be more difficult for plaintiffs to outline the scheme

with great particularity. As a result, plaintiffs alleging market manipulation are

given more leeway in pleading manipulative conduct.[88]

Plaintiffs' allegations do not present the pleading difficulties that

characterize true market manipulation cases. Most of the allegedly fraudulent

conduct was perpetrated directly, in the form of misstatements made to plaintiffs,

---

[87]    *See T.H.C., Inc. v. Fortune Petroleum Corp.*, No. 96 Civ. 2690, 1999
WL 182593, at *3 (S.D.N.Y. Mar. 31, 1999) (collecting cases to explain that "due
to the inherent difficulty in a plaintiff acquiring specific details on a hidden
scheme at the pleading stage, the specificity prong of Rule 9(b) may be alleviated
to a degree.").

[88]    *See id.*

21

rather than indirectly on the public and on the market.[89] The phrase "'pump and dump' is not a talisman" that will convert a claim grounded in misrepresentations into a scheme.[90]

In response to this characterization, plaintiffs argue that the misstatements were only one aspect of a pump and dump scheme, which also included elements directed toward the public, such as the pursuit of famous Board members and the publication of press releases.[91] Yet the facts of this case are similar to those in *Schnell v. Conseco*,[92] which was cited with approval by the Second Circuit in *Lentell*.[93] In *Schnell*, the defendant was accused of "artificially inflat[ing] the price" of a stock by public and private dissemination of false information, including the publication of research reviews to the marketplace as a

---

[89] *See* Def. Mem. at 4.

[90] *DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 123 (S.D.N.Y. 2004) (holding that use of the term "pump and dump" is not sufficient to plead loss causation).

[91] *See* Memorandum of Law in Opposition to Defendants John Brady's and Edward McPhee's Motion to Dismiss ("Pl. Mem."), at 8. However, the Complaint does not specify the nature of the press releases.

[92] 43 F. Supp. 2d 438, 447-48 (S.D.N.Y. 1999).

[93] *See Lentell*, 396 F.3d at 177-78.

whole.[94] The court refused to characterize such allegations as market manipulation claims because the "plaintiff's allegations of misconduct. . . [we]re largely based on misrepresentations and omissions" directed at the marketplace.[95] For the same reasons expressed by the courts in *Schnell* and *Lentell*, plaintiffs in this case cannot avail themselves of the relaxed pleading standards applied to market manipulation claims.

## 2. Misrepresentation or Omission of Fact

As plaintiffs must comply with the pleading requirements of the PSLRA, the Complaint must specify "[1] each statement alleged to have been

---

[94] Specifically, the plaintiff in *Schnell* alleged that defendant Sands

employed the following activities to artificially inflate the price of NALF stock: (1) Sands published and disseminated to investors two Research Reviews that apparently contained a number of misrepresentations; (2) Sands used fictitious investor names to send false opinions on the value of NALF stock to real investors; (3) Sands' brokers made cold calls to unsuspecting investors to solicit sales of NALF stock at the highest price maintainable through Sands' market-making efforts; and (4) Sands failed to inform the public that Conseco, not NALF, obtained the benefit from the Conseco Debentures and that Conseco was positioning itself to acquire NALF.

*Schnell*, 43 F. Supp. 2d at 448 (citations omitted).

[95] *Id. See also Collier v. Aksys Ltd.*, No. 04 Civ. 1232, 2005 WL 1949868, at *14 (D. Conn. Aug. 15, 2005) ("Mr. Collier attempts to find cover under the somewhat relaxed specificity requirements that pertain to market manipulation claims.").

misleading, [2] the reason or reasons why the statement is misleading, and, [3] if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed."[96] The Complaint specifies multiple false or misleading statements that were allegedly made by Brady, and several allegedly made by Ed McPhee. Thus, it meets the first two parts of the PSLRA's three-part requirement. Plaintiffs alleged that: (1) Brady and Ed McPhee represented that there were less outstanding shares than actually existed;[97] (2) Brady said the Company's total debt was two and a half million dollars when it was in fact eight million;[98] (3) Brady misrepresented that Rudolph Giuliani would become part of the Company's Board of Directors, which was "knowingly false and misleading";[99] (4) Brady and Ed McPhee told plaintiffs that the stock price would rise upon certain events when such statements were knowingly false;[100] (5) Brady lied by saying that the Company had completed jobs that it had not actually completed;[101] (6) Brady and Ed McPhee represented that the

---

[96]    15 U.S.C. § 78u-4(b)(1).

[97]    *See* Complaint ¶¶ 22, 26, 32.

[98]    *See id.* ¶ 26.

[99]    *Id.* ¶ 27.

[100]   *See id.* ¶¶ 27-28, 35.

[101]   *See id.* ¶ 27.

Company's financials would soon be disclosed when this was not true.[102]

The third prong of the PSLRA standard requires that if an allegation is made on information or belief, the complaint must state with particularity all facts on which that belief is formed. In their Complaint, plaintiffs "allege [all facts] based on actual knowledge as to their own actions and on information and belief as to the actions of others."[103]

There are many specific allegations about the underlying facts of this claim that are not based on plaintiffs' "own actions," and must thus be presumed to be based on information and belief. For example, plaintiffs allege that defendants "knew that the Company had no infrastructure, expertise or plan to perform as defendants claimed";[104] that "the Company's debt was actually in the amount of approximately $7.8-8.0 million and there were outstanding shares in the amount of

---

[102] *See id.* ¶¶ 37, 47. Plaintiffs also made various allegations that may have concerned misstatements, but never provided the reason why the statement was misleading. For example, plaintiffs pleaded that Brady and Ed McPhee held Ed McPhee out as an officer of the Company, but plaintiffs never alleged that Ed McPhee was in fact *not* an officer of the company. *See, e.g., id.* ¶¶ 22-23, 36. Such allegations have not been included in this list because they do not comply with the second of the three prongs listed above.

[103] *Id.* at 1.

[104] *Id.* ¶ 19.

approximately 38-40 million";[105] and that "[t]he Company had entirely fabricated its prospect of having Giuliani serve on the Board of Directors."[106]

The PSLRA "does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based."[107] However, "[i]n order to survive at this stage, the complaint must state with particularity sufficient facts to support the[se] belief[s]."[108] Despite the specificity of many of the allegations in this Complaint, there is only one allegation in the entire Complaint for which the plaintiffs make any mention of the facts on which their beliefs concerning false statements are based. In this sole instance, plaintiffs allege they "learned through a subcontractor on the Company's first security contract that neither Dan McPhee nor anyone else in the Company had knowledge of or experience in the security industry and that defendants did not have the contracts that they represented."[109]

---

[105]    *Id.* ¶ 60. *See also id.* ¶ 26 ("debt was in excess of $8 million").

[106]    *Id.* ¶ 38.

[107]    *Novak*, 216 F.3d at 313-14.

[108]    *Id.* at 313.

[109]    Complaint ¶ 58. The only document mentioned in the Complaint is Form 10-KSB for the fiscal year ending June 30, 2004, which plaintiffs use to describe the Company's loan agreement. It does not appear to be the basis for plaintiffs' belief concerning any of the false or misleading statements. *See id.* ¶ 20.

Even with the heightened pleading standards under Rule 9(b) and the

PSLRA, the Second Circuit does not "require the pleading of detailed evidentiary

matter in securities litigation."[110] However, the attribution to one unidentified

subcontractor of one particular belief, with no further substantiation, does not

provide enough factual support to state a claim of securities fraud under the

PSLRA.[111] Although the claims set forth in this Complaint allege a group of very

serious misrepresentations, the PSLRA requires plaintiffs to "state with

particularity all facts on which [a] belief is formed."[112] Congress enacted the

information and belief pleading requirement because "[n]aming a party in a civil

suit for fraud is a serious matter. Unwarranted fraud claims can lead to serious

---

[110]    *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 72.

[111]    For examples of cases in which the Complaint specified the allegations based on information and belief with sufficient facts to support them, see, e.g., *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d at 355-59 ("Plaintiffs submitted a chart . . . identifying which paragraphs of the 309 Complaints and the Master Allegations were based on information and belief, and the basis for those beliefs. Plaintiffs identified eleven categories of sources. . ."); *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 327 n.4 (D. Mass. 2002) ("The Plaintiffs have formatted their complaint such that, at the end of each sentence or clause, a series of symbols is provided in carats. The symbols, which may be cross-referenced to a definitional table attached to the complaint, identify the source of the information and, or, the legal significance.").

[112]    15 U.S.C. § 78u-4(b)(1).

injury to reputation for which our legal system effectively offers no redress."[113] Accordingly, plaintiffs' securities claims must be dismissed.

## B.    Transaction Causation

For the same reasons that plaintiffs have not alleged a market manipulation scheme, the fraud on the market theory will not substitute for a showing of direct reliance. The Complaint repeatedly alleges that the false statements "were meant to and did influence plaintiffs who purchased and retained stock in reliance thereon."[114] But "[t]he general rule is that *reasonable* reliance must be proved as an element of a securities fraud claim."[115] Defendants argue that reliance on the alleged fraudulent acts would have been unreasonable.[116]

"In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them."[117] *First*, defendants cite the inherent risks in the

---

[113]    H.R. Rep. No. 104-369, at 41 (1995) (Conf. Rep.).

[114]    Complaint ¶ 26. *See also id.* ¶¶ 27, 27, 35.

[115]    *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir. 1996) (emphasis added).

[116]    *See* Def. Mem. at 7-10; Reply Mem. at 3-5.

[117]    *Emergent Capital Inv. Mgmt.*, 343 F.3d at 195.

plaintiffs' actions, given that they were trading in stocks quoted in the Pink Sheets.[118] *Second*, they argue that plaintiffs received "storm warnings" in the form of unkept promises from the defendants that should have alerted plaintiffs to the risk of fraud.[119] These arguments raise a question as to plaintiffs' reasonableness, and "a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament."[120] However, plaintiffs counter that Scotto had a long-standing and trusting relationship with Brady and relied on Brady's superior expertise, and that plaintiffs had no access to any relevant information that would have revealed a fraud.[121]

These arguments do not lend themselves to resolution on a motion to dismiss.[122] "As the Court on this record cannot exclude the possibility that plaintiff

---

[118]    Defendants rely on the SEC's public website to argue that stocks quoted in the Pink Sheets are inherently risky: "Many of the[] companies [quoted in the Pink Sheets] do not file periodic reports or audited financial statements with the SEC, making it very difficult for investors to find reliable, unbiased information about those companies." Def. Mem. at 7 n.5 (quoting U.S. Securities and Exchange Commission, "Pink Sheets," www.sec.gov/answers/pink.htm.).

[119]    *See* Def. Mem. at 8-9.

[120]    *Emergent Capital Inv. Mgmt.*, 343 F.3d at 195.

[121]    *See* Pl. Mem. at 19.

[122]    *See Waltree Ltd. v. Ing Furman Selz L.L.C.*, 97 F. Supp. 2d 464, 469 (S.D.N.Y. 2000) (declining to dismiss the case although there were some facts indicating that reliance was unreasonable); *Doehla v. Wathne Ltd., Inc.*, No. 98 Civ. 6087, 1999 WL 566311, at *13-14 (S.D.N.Y. Aug. 3, 1999) (same); *DIMON.*

might prove facts under the current pleading that would entitle it to relief," defendants' motion to dismiss these claims cannot be granted on the basis of an insufficient pleading of transaction causation.[123]

## C.    Loss Causation

Plaintiffs state that defendants' conduct had an inflationary effect on the Company's stock price and that there was eventually a "market correction" of the inflated price.[124] Thus, plaintiffs conclude, "defendants' misrepresentations caused the collapse in the market for the Company's stock."[125] In *Dura,* the Supreme Court characterized the pleading of loss causation as follows:

> Most importantly, the complaint says the following (and nothing significantly more than the following) about economic losses attributable to the ... misstatement: 'In reliance on the integrity of the market, [the plaintiffs] ... paid artificially inflated prices for Dura securities' and the plaintiffs suffered 'damage[s]' thereby.[126]

Although plaintiffs use different words to describe their theory of loss causation, it is fundamentally indistinguishable from the theory rejected in *Dura.*

The inadequacy of plaintiffs' pleading is also clear from the holding of

_____

*Inc. v. Folium, Inc.,* 48 F. Supp. 2d 359, 372 (S.D.N.Y. 1999) (same).

[123]    *DIMON, Inc.,* 48 F. Supp. 2d at 372.

[124]    Pl. Mem. at 16.

[125]    *Id.*

[126]    *Dura Pharms., Inc.,* 125 S. Ct. at 1630 (citations omitted).

30

*Lentell,* which "require[s] both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk."[127] Here, although it is arguably foreseeable that the alleged fraud would cause harm, plaintiffs do not provide any support for the allegation that their loss was caused by the materialization of the concealed risk.

Plaintiffs make no direct attempt to defend their pleadings in the light of *Dura* or *Lentell.* They also fail to analyze the effect of these controlling authorities on the cases they cite, all of which preceded *Dura.*[128] Plaintiffs argue that they "have alleged a factual link between the decline in the Company's stock and defendants' misconduct."[129] This is simply untrue, as suggested by the fact that the relevant section of plaintiffs' brief does not contain a single citation to the Complaint.[130] Indeed, there is no particular allegation in the Complaint directly supporting the theory that the disclosure or the materialization of the concealed risk led to plaintiffs' loss. After alleging that plaintiffs relied on defendants' misrepresentations in deciding to "pay inflated prices for shares in the

---

[127]    *See Lentell,* 396 F.3d at 173 (emphasis in original).

[128]    *See* Pl. Mem. at 16-18.

[129]    *Id.* at 17-18.

[130]    *See id.* at 16-18.

31

Company,"[131] the Complaint abruptly concludes by stating: "As of this date, October 14, 2005, the Company's stock is listed at 5 cents per share."[132] This side-by-side placement does not establish a "a factual link between the decline in the Company's stock and defendants' misconduct" under the controlling precedents.

To establish such a link, plaintiffs could mention the price of the Company's stock on specific dates, indicating that the stock price went up after misstatements and went down after disclosures. To the extent these allegations tend to show that the materialization of the concealed risk caused plaintiffs' damages, they would constitute an acceptable pleading of loss causation. Alternatively, plaintiffs could offer factual support that the ten press releases they mention constituted specific disclosures of the fraudulently concealed information and then support the contention that the stock price dropped significantly after their issuance. But in its current form, the Complaint merits dismissal under the reasoning of *Dura*.

## D.    State Law Claims

### 1.    Common Law Fraud

Because state law fraud claims require a pleading of proximate

---

[131]    Complaint ¶ 63.

[132]    *Id.* ¶ 64.

causation, the deficiency in plaintiffs' pleading of loss causation likely dooms its

remaining state law claim.[133] However, there is no need to dismiss this claim with

prejudice at this stage of the litigation, as the plaintiffs might choose to replead

their claim.

### 2.    Breach of Fiduciary Duty and Negligent Misrepresentation

The Martin Act, New York's blue sky law governing securities fraud,

provides for the attorney general to regulate and enforce New York's securities

laws.[134] Plaintiffs argue that preemption of private remedies for negligence is at

odds with the Martin Act's goal of enhancing investor protection.[135] However, the

Second Circuit has made clear that in the context of a securities fraud case, a claim

for breach of fiduciary duty is preempted by the Martin Act.[136] The Second Circuit

has not made a similar ruling with respect to negligent misrepresentation, but the

great majority of state appellate and federal district courts find preemption

---

[133]    *See Rich v. Maidstone Fin., Inc.*, No. 98 Civ. 2569, 2002 WL
31867724, at *13 (S.D.N.Y. Dec. 20, 2002) (deciding that "[b]ecause [the
elements of common law fraud] are substantially identical to those governing §
10(b), the identical analysis applies") (internal citation omitted).

[134]    *See* N.Y. Gen. Bus. Law Art. 23-A §§ 352 *et seq.*

[135]    *See* Pl. Mem. at 21.

[136]    *See Castellano*, 257 F.3d at 190.

warranted in such instances.[137] Thus, plaintiffs' negligent misrepresentation and fiduciary duty claims are preempted as a matter of law and must be dismissed.

## V.  CONCLUSION

For the foregoing reasons, the motion to dismiss submitted by Ed McPhee and John Brady is granted without prejudice. Plaintiffs are granted leave to replead within twenty days of this Opinion and Order, in a manner consistent with this Opinion. The Clerk is directed to close this motion [number 14 on the docket sheet].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           January 3, 2006

---

[137]  *See, e.g., Marcus v. Frome,* 329 F. Supp. 2d 464, 475-76 (S.D.N.Y. 2004) (dismissing negligent misrepresentation claim on preemption grounds and collecting cases); *Gabriel Capital, L.P. v. Natwest Fin., Inc.,* 137 F. Supp. 2d 251, 266-67 (S.D.N.Y. 2000) ("Because [plaintiff]'s negligence and breach of fiduciary duty claims are covered by the Martin Act, these claims must be dismissed."); *Granite Partners, L.P. v. Bear, Stearns & Co.,* 17 F. Supp. 2d 275, 291 (S.D.N.Y. 1998) ("it is well established that there exists no private right of action for claims that are within the purview of the Martin Act."). Plaintiffs can identify only one district court case and one New York appellate court case in support of their argument, both from 2001. *See* Pl. Mem. at 21. But the majority of state intermediate appellate courts reject this view, and "[p]rinciples of federalism and respect for state courts' interpretation of their own laws counsel against ignoring these rulings." *Castellano,* 257 F.3d at 190.

34

## - Appearances -

**For Plaintiffs:**

Richard S. Ciacci, Esq.
Todtman, Nachamie, Spizz & Johns, P.C.
425 Park Avenue
New York, NY 10012
(212) 754-9400

**For Defendants:**

Eric S. Hutner, Esq.
Hutner Klarish L.L.P.
1359 Broadway, Suite 2001
New York, NY 10018
(212) 391-9235