UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
:
HARRY CATTON, PHILLIP MARKS,
STEVEN KEVELSON, JOHN SCOTTO,
ERIK KAHN, ROBERT WISSENBACH,
and JOHN DOES 1-10,
:
                    Plaintiffs,
:
   - against -
:
DEFENSE TECHNOLOGY SYSTEMS, INC.,:
JOHN BRADY, EDWARD McPHEE,
DANIEL McPHEE, and PHILLIP RAUSCH, :
:
              Defendants.
:
---------------------------------------------------------------X

**OPINION AND ORDER**

**05 Civ. 6954 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  2-20-06

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Plaintiffs bring this case on behalf of certain purchasers of common stock in Defense Technology Systems, Inc. ("the Company"). The gravamen of plaintiffs' allegations is that the Company was an "empty shell," with no employees, infrastructure, product, or services. Defendants allegedly manipulated the price of the Company's stock and fraudulently induced plaintiffs to purchase

it, and then sold their own shares for a substantial personal gain.[1]

Plaintiffs allege violations of section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") and also bring a cause of action for common law fraud.[2] In November 2005, two of the defendants, John Brady and Ed McPhee, moved to dismiss plaintiffs' Complaint. That motion was granted based on plaintiffs' failure to plead with particularity and failure to plead loss causation. Leave to amend was granted and on January 30, 2006, plaintiffs filed a Second Amended Complaint, in which they added an additional claim under section 20(a) of the Exchange Act.[3] Defendants Brady and Ed McPhee now move to dismiss all claims against them pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).[4] In support of their motion, Brady and Ed McPhee argue that the section 10(b) pleadings are insufficient as a matter of law due to: 1) a failure to plead loss causation and 2) a failure to plead with particularity, especially with respect to five

---

[1]     *See* Second Amended Complaint ("Complaint") ¶¶ 7, 102.

[2]     *See* 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10(b)(5). *See also* Complaint ¶¶ 110-118, 123-129.

[3]     *See* Complaint ¶¶ 119-122.

[4]     *See generally* Memorandum of Law Submitted by Defendants John Brady and Edward McPhee in Support of Their Motion to Dismiss the Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) ("Def. Mem.").

particular plaintiffs and defendant Ed McPhee.[5]  In addition, Brady and Ed

McPhee argue that plaintiffs have failed to properly allege that either of them is a

control person under section 20(a).

As explained in greater detail below, plaintiffs have pleaded loss

causation in their Second Amended Complaint.  The new Complaint has also

described a market manipulation scheme that is not based solely on

misrepresentations and omissions, and described the scheme with sufficient

particularity.  The control person liability claims also survive, as they satisfy the

pleading requirements of Rule 8.  For these reasons, defendants' motion is denied.

## II.    BACKGROUND

The following allegations, drawn from the Second Amended

Complaint, are presumed to be true for purposes of this motion.  In August 2003,

defendants Brady and Ed McPhee, posing as the "Augustine Fund," entered into

an agreement with Christopher Francis, one of the largest shareholders of the

Company.[6]  Each received at least 4,250,000 shares of free-trading stock in the

---

[5]       The moving defendants do not make separate arguments regarding
plaintiffs' state law claim.  For the purposes of this motion, it will be treated as
identical to the 10(b) claim.  *See Rich v. Maidstone Fin., Inc.*, No. 98 Civ. 2569,
2002 WL 31867724, at *13 (S.D.N.Y. Dec. 20, 2002) (deciding that "[b]ecause
[the elements of common law fraud] are substantially identical to those governing
§ 10(b), the identical analysis applies") (internal citation omitted).

[6]       *See* Complaint ¶¶ 28-31.

3

Company, in return for .001 cent per share plus a release of all claims against Francis, who had personally guaranteed many of the Company's debts.[7] That same month, Brady and Ed McPhee contacted Brady's close friend John Scotto.[8] Brady introduced Ed McPhee as an officer of the Company, and they informed Scotto that Ed McPhee and Dan McPhee had made a deal to buy eight million shares of the Company.[9] Brady and Ed McPhee said they were planning to retire the shares, which would reduce the Company's outstanding shares to seventeen million.[10] Both representations were false.[11] In fact, defendants had no plans to retire the shares, and knew that the number of outstanding shares was at least thirty million.[12] During this period, defendants also engaged in matching trades to secretly increase their control over the Company.[13]

Brady, Ed McPhee, and Dan McPhee told Scotto that they were changing the Company's business plan from a data distribution network to a

---

[7]  *See id.* ¶¶ 29, 31.

[8]  *See id.* ¶ 27.

[9]  *See id.*

[10]  *See id.*

[11]  *See id.*

[12]  *See id.*

[13]  *See id.* ¶¶ 34-35.

4

security company.[14]   They said that the Company would be the sole designer, manufacturer, and installer of ballistic glass and barriers in New York City.[15] Defendants even arranged a false public demonstration of ballistic glass as an advertisement for the Company – "the scam was that the product demonstrated was manufactured by a [different] company, Gaffco, and that the Company had nothing to do with it."[16]   Despite defendants' attempts to build the Company's reputation as a security company, it "had no products, infrastructure, financing, expertise or plan to perform as defendants claimed."[17]

Brady and Dan McPhee falsely represented to plaintiffs that the Company had only two and a half million dollars in debt.[18]   On numerous occasions, plaintiffs requested that Brady, Ed McPhee, and Dan McPhee provide them with financial documents regarding the Company.[19]   In response, Brady

---

[14]    *See id.* ¶ 37.

[15]    *See id.* ¶ 38.

[16]    *Id.* ¶ 81.

[17]    *Id.* ¶ 26.

[18]    *See id.* ¶ 39. In fact, the Company had more than eight million dollars in debt. *See id.* ¶ 42.

[19]    *See id.* ¶ 45. No documents were publicly available because the Company was over two years late in its SEC filings. *See id.* Defendants continued to avoid making the required filings for the duration of the scheme. *See id.* ¶ 40.

admonished plaintiffs that they should trust him.[20]  Brady represented that he was

in control of the Company, and Ed McPhee was generally introduced as an

officer.[21]  Brady and Dan McPhee also made false public representations that

Rudolph Giuliani was going to become part of the Board of Directors of the

Company, and that the Company had just completed a security job for Fox Cable

News for more than one million dollars.[22]  In addition, Brady repeatedly stated that

once the Company was approved to be quoted on the OTC Bulletin Board,[23] he

would bring in institutions that would purchase more than five million shares and

the stock value would increase to between two and three dollars per share.[24]  In

fact, "these statements were knowingly false and misleading when made and were

designed to and did deceive plaintiffs into purchasing and retaining stock."[25]

---

[20]     *See id.* ¶ 45.

[21]     *See id.* ¶ 21, 23, 27, 38.

[22]     *See id.* ¶ 43.

[23]     The OTC Bulletin Board ("OTCBB") has a rule that "require[s]
companies whose securities [a]re quoted on the OTCBB to file updated financial
reports with the SEC or with their banking or insurance regulators. If these
companies fail[] to file current financial reports, their securities w[ill] be removed
from the OTCBB, but c[an] be quoted in another system, such as the Pink Sheets."
United States Securities and Exchange Commission, "OTC Bulletin Board
(OTCBB) Eligibility Rule," http://www.sec.gov/answers/otcbbel.htm.

[24]     *See* Complaint ¶ 44.

[25]     *Id.*

On August 26, 2003, the Company began trading on the Pink Sheets.[26]  During the following months, defendants Brady, Ed McPhee and Dan McPhee contacted the other plaintiffs and met with each of them personally, repeating the misstatements used to promote the Company.[27]

In early October, Ed McPhee, Dan McPhee, and Brady told Scotto that Giuliani was not going to be on the Board of Directors.[28]  In fact, Giuliani "was never a true prospect and had never even been contacted by defendants."[29]  The three defendants asked Scotto to suggest possible Board candidates, and Scotto recommended Bernard Kerik, who had security expertise, and Donald DiRenzo, who had a real estate background.[30]  On October 29, 2003,  Kerik agreed to be an advisor to the Board, and Brady and Ed McPhee gave Kerik four hundred

---

[26]     *See id* ¶¶ 47-48.  According to the Securities and Exchange Commission, "[t]he Pink Sheets does not require companies whose securities are quoted upon its systems to meet any listing requirements. . . .  [T]he companies quoted in the Pink Sheets tend to be closely held, extremely small and/or thinly traded.  Most do not meet the minimum listing requirements for trading on a national securities exchange, such as the New York Stock Exchange or the NASDAQ Stock Market."  United States Securities and Exchange Commission, "Pink Sheets," www.sec.gov/answers/pink.htm.

[27]     *See* Complaint ¶ 51.

[28]     *See id.* ¶ 56.

[29]     *Id.* ¶ 44.

[30]     *See id.* ¶ 56.

thousand shares of the Company's free-trading stock.[31] During the course of defendants' negotiations with Kerik and following the public announcement of his appointment, the value of the Company's stock hit a new high of ninety-six cents.[32] On November 13, 2003, DiRenzo agreed to join the Board of Advisors, and Dan McPhee directed Brady and Ed McPhee to transfer two hundred thousand shares of unrestricted stock to DiRenzo.[33]

Between September 2003 and February 2004, Brady and Ed McPhee had advance notice of ten confidential Press Releases.[34] Dan McPhee would email these to his brother Ed and Brady before they were made public, and defendants traded on this inside information.[35] When a press release was issued, a "frenzy of trading of the Company's stock" usually occurred in the hours preceding the release.[36] This enabled defendants to "dump" their stock by selling their shares at artificially inflated prices, at a substantial profit to themselves.[37] Indeed,

---

[31]   *See id.* ¶ 60.

[32]   *See id.* ¶¶ 64, 78.

[33]   *See id.* ¶ 69.

[34]   *See id.* ¶ 70.

[35]   *See id.*

[36]   *Id.* ¶ 71.

[37]   *See id.*

defendants eventually "admitted selling off their shares during this period."[38]

Based on their reliance on defendants' false representations and public promotion, plaintiffs spent a total of approximately two and a half million dollars on shares in the Company.[39]  As the truth about the Company was discovered, the stock price fell rapidly from its high of ninety-six cents.[40]  As of January 30, 2006, when the Complaint was filed, the Company's stock was listed at three cents per share.[41]

## III.  LEGAL STANDARDS

### A.  Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.'"[42]  Generally, the task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in

---

[38]    *Id.*

[39]    *See id.* ¶ 1.

[40]    *See id.* ¶¶ 88-89, 99-103.

[41]    *See id.* ¶ 109.

[42]    *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

support thereof."[43]

When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor.[44] Although the plaintiff's allegations are taken as true, the claim may still fail as a matter of law if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief, or if the claim is not legally feasible.[45]

## B.    Section 10(b) Claims

To state a prima facie case of securities fraud under section 10(b) and Rule 10b-5 of the Exchange Act, a plaintiff must allege that "'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on

---

[43]    *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir. 2004) (quotation marks and citation omitted).

[44]    *See Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 31 (2d Cir. 2004) (citation omitted).

[45]    *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, L.L.P.*, 322 F.3d 147, 158 (2d Cir. 2003); *Stamelman v. Fleishman-Hillard, Inc.*, No. 02 Civ. 8318, 2003 WL 21782645, at \*2 (S.D.N.Y. July 31, 2003).

defendant's action caused injury to the plaintiff.'"[46] Plaintiffs are also required to plead the alleged fraudulent conduct with sufficient particularity and allege loss causation.[47]

### 1. Particularity of the Facts Pleaded

The level of particularity required in the pleading of 10b-5 claims depends upon whether a claim is based on allegations of a market manipulation scheme or on allegations of misstatements and omissions. To plead a market manipulation scheme, plaintiffs must satisfy Rule 9(b) by stating "the circumstances constituting fraud . . . with particularity."[48] Rule 9(b) does not, however, require "the pleading of detailed evidentiary matter in securities litigation."[49]

To plead a material misrepresentation or omission under the

---

[46] *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003) (quoting *Ganino v. Citizens Utils. Corp.*, 228 F.3d 154, 161 (2d Cir. 2000) (citing cases)).

[47] *See, e.g., Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172-78 (2d Cir. 2005). The other elements of a section 10(b) claim are not at issue here, because defendants do not challenge the adequacy of plaintiffs' pleadings of falsity, scienter or reliance. *See* Def. Mem. at 3-4; Reply Memorandum of Law Submitted by Defendants Brady and Ed McPhee in Further Support of Their Motion to Dismiss the Second Amended Complaint ("Reply Mem.") at 1.

[48] Fed. R. Civ. P. 9(b).

[49] *In re Scholastic Comm. Secs. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

heightened pleading requirements of the PSLRA, a complaint must

> specify each statement alleged to have been misleading, the
> reason or reasons why the statement is misleading, and, if an
> allegation regarding the statement or omission is made on
> information or belief, the complaint shall state with particularity
> all facts on which that belief is formed.[50]

Plaintiffs are not permitted to avoid the PSLRA's requirements by framing a

misstatement claim as a market manipulation scheme. In its recent opinion in

*Lentell v. Merrill Lynch*, the Second Circuit held that "where the sole basis for

[market manipulation] claims is alleged misrepresentations or omissions, plaintiffs

have not made out a market manipulation claim . . . and remain subject to the

heightened pleading requirements of the PSLRA."[51]

## 2. Loss Causation

To maintain a claim of securities fraud, a plaintiff must plead "loss

causation," which means that defendant's conduct caused plaintiff's loss, at least

in part.[52] A plaintiff cannot simply allege that she purchased securities at

artificially inflated prices.[53] The Supreme Court recently noted in *Dura*

---

[50]  15 U.S.C. § 78u-4(b)(1).

[51]  *Lentell*, 396 F.3d at 177.

[52]  *See, e.g., id.* at 173-75.

[53]  *See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 340 (2005).

*Pharmaceuticals, Inc. v. Broudo* that:

> [I]t should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid.[54]

The Second Circuit's opinion in *Lentell* referred to several permissible ways of pleading loss causation, including direct causation,[55] "materialization of risk,"[56] and "corrective disclosure."[57] The "common thread is that, in each situation, 'the loss be foreseeable and [] the loss be caused by the materialization of the concealed risk.'"[58]

## B. Section 20(a) Claims

Section 20(a) of the Exchange Act creates a cause of action against

---

[54]     *Id.* at 347.

[55]     *See Lentell*, 396 F.3d at 174 ("If that relationship [between 'the plaintiff's investment loss and the information misstated'] is sufficiently direct, loss causation is established. . . .").

[56]     *Id.* at 173 (requiring "that the loss be caused by the materialization of the concealed risk").

[57]     *Id.* at 175 n.4 (finding that, because plaintiffs alleged no corrective disclosures, they could not establish loss causation).

[58]     *In re Initial Public Offering Secs. Litig.*, 399 F. Supp. 2d 298, 304 (S.D.N.Y. 2005) (quoting *Lentell*, 396 F.3d at 173 (emphasis omitted)).

defendants alleged to have been "control persons" of those engaged in the primary securities fraud. The section provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.[59]

"The statutory language identifies two components to a control person claim: (1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant."[60] Primary liability by the controlling person is not a necessary predicate to a section 20(a) claim, which is typically used to sue defendants who do not have primary liability.[61]

"Allegations of control are not averments of fraud and therefore need not be pleaded with particularity."[62] Pleading control is done under Rule 8, and

---

[59]     15 U.S.C. § 78t(a).

[60]     *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 414 (S.D.N.Y. 2003).

[61]     *See In re Initial Public Offering Secs. Litig.,* 241 F. Supp. 2d 281, 392 n.178 (S.D.N.Y. 2003) ("In that sense, Section 20 serves as a statutory form of respondeat superior.").

[62]     *In re Parmalat Secs. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006).

14

thus "[a] short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required."[63]

## IV.   DISCUSSION

### A.   Section 10(b) Claims

#### 1.   Particularity of the Facts Pleaded

Defendants argue that plaintiffs have failed to plead the allegedly fraudulent conduct with sufficient particularity to support a finding of securities fraud.  As discussed earlier, the level of particularity required depends on whether plaintiffs alleged a market manipulation scheme or a misrepresentations and omissions claim.

I previously recognized that the phrase "'pump and dump' is not a talisman" capable of converting a claim grounded in misrepresentations into a scheme.[64]  With their prior Complaint, plaintiffs presented a case solely based on misrepresentations as in *Lentell*, and were thus not permitted to avail themselves

---

[63]      *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d at 415-16.

[64]      *See Catton v. Defense Tech. Sys., Inc.*, No. 05 Civ. 6954, 2006 WL 27470, at *7 (S.D.N.Y. Jan. 3, 2006) (quoting *DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 124 (S.D.N.Y. 2004)).

of the pleading standards applied to market manipulation claims.[65]

In the Second Amended Complaint, plaintiffs have expanded the description of the alleged scheme to defraud such that it can no longer be said to be based primarily on misrepresentations. The additional facts pleaded tell a story in which defendants used various forms of fraudulent conduct to "conjure[] up the notion of a company that did not exist"and used the securities market to profit from this scheme.[66] Misrepresentations are still a large part of this story – plaintiffs do allege that defendants "disseminated false and misleading information to affect share prices."[67] But plaintiffs also specifically allege that the market manipulation scheme was furthered through: matched orders,[68] public activities to "pump up" the value of the stock,[69] strategic dumping of stock to make a profit,[70]

---

[65]    See id.

[66]    Memorandum of Law in Opposition to Defendants John Brady's and Edward McPhee's Motion to Dismiss the Second Amended Complaint ("Pl. Mem.") at 1.

[67]    Id. at 9-10.

[68]    See Complaint ¶¶ 33-34 (alleging matching trades between Brady and a former owner of the Company's stock named Ed Goodstein).

[69]    See Complaint ¶ 44 ("Giuliani prospect"); ¶¶ 57-69 (Board of Advisors negotiations); ¶¶ 74-82, 87 (press releases); ¶ 81 (public demonstration of ballistic glass).

[70]    See id. ¶¶ 71, 83.

and active concealment of information that would have exposed the scheme.[71]

Because I find that plaintiffs have pleaded a market manipulation scheme, their claims must comply with Rule 9(b), which requires particularity, but does not require "the pleading of detailed evidentiary matter."[72] The litany of fraudulent statements and manipulative conduct in the Complaint is clearly sufficient to satisfy Rule 9(b). In addition, the fact that this is a market manipulation case renders moot defendants' argument that the so-called "minor plaintiffs" should be dismissed from the case for failure to state a claim.[73]

### 2. Loss Causation

Plaintiffs' theory of loss causation is that the materialization of the risks that had been fraudulently concealed "caused the collapse in the market for

---

[71] Required SEC filings were never made by any of the defendants, and plaintiffs claim that "[h]ad these filings been made, plaintiffs would have known of the improper trading transactions executed on behalf of the defendants." *Id.* ¶ 40.

[72] *In re Scholastic Comm. Secs. Litig.*, 252 F.3d at 72.

[73] Defendants recognize this. *See* Def. Mem. at 19 ("[T]his case as pleaded is a classic misrepresentation/omission case. As such, each of the six separate plaintiffs . . . must plead all elements of a 10b-5 claim to survive a motion to dismiss."); Reply Mem. at 4 ("Having failed to allege that the so-called fraud involves a manipulative device, as opposed to a series of alleged misrepresentations, each of the six plaintiffs must allege the particulars of their misrepresentation claim . . . .").

the Company's stock and losses to plaintiffs."[74] Unlike the pleadings considered

in the first motion to dismiss, the Second Amended Complaint supports this theory

with some facts that demonstrate that the plaintiffs' losses may have been caused

by the materialization of the central risk concealed by defendants – that the

Company's stock price would plummet when the market discovered that the

Company was an "empty shell."[75]

   One example of the detailed pleading of loss causation is a

description of a meeting of the Company's Advisory Board on February 4, 2004,

at which attendees discovered that the Company's debt was four million rather

than two and a half million dollars and that there were thirty million rather than

twenty-five million shares outstanding.[76] In addition, defendants "gave the

Advisory Board equivocal answers regarding the Company's experience in the

industry and its infrastructure."[77] Plaintiffs claim that as a result of this disclosure,

the stock price declined steadily from forty-four cents to sixteen cents in the next

two months.[78] There was also a decrease in the stock's value following a visit by

---

[74] Pl. Mem. at 14.

[75] Complaint ¶ 102.

[76] *See id.* ¶ 88.

[77] *Id.*

[78] *See id.* ¶ 89.

plaintiff John Scotto to the Company's "facilities" in July of 2004. Scotto learned that the Company was a shell, and by the end of August, the stock's price had declined from thirty-nine to ten cents per share.[79] These two examples of a disclosure leading immediately to a fall in stock prices "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind," and thus constitute sufficient allegations of loss causation under *Dura* and *Lentell*.[80]

### 3.  Plaintiffs Have Stated a 10(b) Claim Against Ed McPhee

Defendants argue that plaintiffs "have failed to state a claim, or state a claim with sufficient particularity, against defendant Ed McPhee."[81] But the Complaint contains many specific allegations against Ed McPhee. With Brady, he was an initial purchaser of more that 4,250,000 shares from Francis, for nominal consideration, and never filed required forms.[82] Ed McPhee was one of the defendants who contacted plaintiffs to urge them to purchase shares in the

---

[79]  *See id.* ¶¶ 99-103.

[80]  *Dura Pharms.*, 544 U.S. at 347.

[81]  Def. Mem. at 23.

[82]  *See* Complaint ¶ 31.

Company,[83] and he regularly promoted the Company's stock at Scotto's restaurant in mid-town Manhattan.[84] He made predictions of the future value of the stock based on facts that he knew could never occur,[85] lied to plaintiffs about the number of outstanding shares and the fact that shares would be retired,[86] and lied about the amount of the Company's debt and of outstanding stock.[87] He attended a meeting in Florida in which he and Dan McPhee misrepresented their own roles and that of an investor in order to mislead plaintiff John Scotto.[88] He used misrepresentations in seeking prestigious candidates for the Board of Directors.[89] He was one of the defendants who called plaintiffs to urge them to retain their stock and continue purchasing stock in the Company.[90] On the strength of these allegations, I find that plaintiffs have adequately pleaded Ed McPhee's involvement in a scheme to defraud with particularity as required by Rule 9(b).

---

[83] *See id.* ¶ 51.

[84] *See id.* ¶ 52.

[85] *See id.* ¶ 53.

[86] *See id.* ¶ 27.

[87] *See id.* ¶ 39.

[88] *See id.* ¶ 54.

[89] *See id.* ¶¶ 56, 67.

[90] *See id.* ¶ 80.

## B.     Section 20(a) Claims

Plaintiffs have sufficiently alleged control person liability with

respect to both moving defendants under Rule 8.  Plaintiffs allege that "[b]y virtue

of their high level and controlling positions within the Company, participation in

and/or awareness of the Company's actual performance, these defendants had the

requisite power to directly or indirectly control or influence specific corporate

policy."[91]  Both moving defendants are themselves charged with putting the

Company together.[92]  Also, "[a]t all relevant times, Brady held himself out and

acted as a decisionmaker of the Company."[93]  Ed McPhee held himself out as an

officer of the Company,[94] and served as a "vehicle" through which other

defendants traded stock for the Company.[95]  These allegations make out the

requisite short, plain statements that give defendants fair notice of the claim that

Brady and Ed McPhee acted as control persons.

## V.     CONCLUSION

For the foregoing reasons, the motion to dismiss submitted by Ed

---

[91]     *Id.* ¶ 120.

[92]     *See id.* ¶ 37.

[93]     *See id.* ¶ 21.

[94]     *See id.* ¶ 27.

[95]     *See id.* ¶ 23.

21

McPhee and John Brady is denied. The Clerk is directed to close this motion

[number 36 on the docket sheet]. A conference is scheduled for July 7, 2006, at

4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          June 20, 2006

**For Plaintiffs:**

Richard S. Ciacci, Esq.
Todtman, Nachamie, Spizz & Johns, P.C.
425 Park Avenue
New York, NY 10012
(212) 754-9400

**For Defendants:**

Eric S. Hutner, Esq.
Hutner Klarish L.L.P.
1359 Broadway, Suite 2001
New York, NY 10018
(212) 391-9235