UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
HARRY CATTON, PHILLIP MARKS,
STEPHEN KEVELSON, JOHN                        Docket No. 05-CV-6954
SCOTTO, ERIK KAHN, ROBERT WISSENBACH,         ECF Case (SAS)
AND JOHN DOES 1-10,

                                Plaintiffs,

        -against-

DEFENSE TECHNOLOGY SYSTEMS, INC.,
JOHN BRADY, EDWARD McPHEE, DANIEL
McPHEE AND PHILLIP RAUSCH,

                                Defendants.
-----------------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION TO INVOKE THE CRIME-FRAUD-TORT EXCEPTION
TO THE ATTORNEY CLIENT PRIVILEGE**


Richard S. Ciacci (RC-0167)
Nicole V. Barbaro (NB-3422)
TODTMAN, NACHAMIE, SPIZZ
  & JOHNS, P.C.
425 Park Avenue
New York, NY  10022
(212) 754-9400

## TABLE OF CONTENTS

Preliminary Statement...................................................................................................1

Statement of Facts.........................................................................................................3

    1. The Complaint.........................................................................................................3

    2. Attorney Hariton's Representation of the Company .......................................4

        A. The Status of the Transferor of Shares.................................................4

        B. Misrepresentations Concerning the Transferees
           of the Shares and Affiliate Status ................................................5

    3. Misrepresentations Concerning the Chris Francis Transaction ..................5

    4. Misrepresentations Concerning the Company's Good Standing Status    .9

    5. Further Misrepresentations Concerning John Brady
       and his Use of the Company's Stock as "Currency" ...........................................10

    6. Further Misrepresentations Concerning the Robert Schanz Transactions ..12

    7. Misrepresentations Concerning Larry Dobroff...............................................14

    8. Further Misrepresentations Concerning Edward McPhee.............................15

    9. Further Misrepresentations Generally ...............................................................15

ARGUMENT...................................................................................................................17

    1. The Crime-Fraud-Tort Standard........................................................................17

    2. In Furtherance of Illegal Transactions ...........................................................18

        A. The Fraud of "Matched Offers"..............................................................18

        B. The Fraud of Issuing Free-Trading Shares to Affiliate......................18

    3. The Fraud Concerning the Company's "Good Standing"................................19

    4. The Fraud of Using the Company's Stock as "Currency"...............................20

CONCLUSION ................................................................................................................21

## TABLE OF AUTHORITIES

### Federal Cases

Antidote Int'l Films, Inc. v. Bloomsbury Publishing, PLC,
242 F.R.D. 248 (S.D.N.Y. 2007) ...................................................................................................17

Shahinian v. Tankian,
242 F.R.D. 255 (S.D.N.Y. 2007) ...................................................................................................17

### State Cases

Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker,
1 A.D.3d 223, 767 N.Y.S.2d 228 (1st Dep't 2003) ........................................................................17

Surgical Design Co. v. Correa,
284 A.D.2d 528, 727 N.Y.S.2d 462 (2d Dep't 2001)....................................................................17

In re Grand Jury Subpoena of Stewart, 144 Misc. 2d 1012, 1020, 545 N.Y.S.2d 974,
979 (Sup. Ct. N.Y. Co.), aff'd as modified, 156 A.D.2d 294 (1st Dep't 1989).............................18

People v. Doe,
99 Misc. 2d 41, 416, 416 N.Y.S.2d 466 (Sup. Ct. Queens Co. 1979) ..........................................18

### Statutes

Rule 144 of The Securities Act of 1933, as amended.......................................................................5

Plaintiffs submit this memorandum of law, together with the accompanying Certification of Nicole V. Barbaro, dated October 12, 2007 (and the exhibits annexed thereto), in support of their motion to invoke the crime-fraud-tort exception of the attorney-client privilege in order to obtain discovery of the communications between defendant Defense Technology Systems, Inc., a/k/a Dataworld Solutions, Inc. (collectively, the "Company") and the Company's former counsel, Frank Hariton, Esq.

## PRELIMINARY STATEMENT

This motion seeks to compel the disclosure of alleged privileged communications between an attorney and client that were in furtherance of a fraudulent scheme. The below facts and analysis demonstrate that, through these communications, defendants not only furthered, but actually perpetrated, their misrepresentations and fraudulent acts.[1]

On Monday, October 1, 2007, Frank Hariton, Esq. (the Company's former counsel) testified several times that, with the benefit of hindsight, the Company may have been misrepresenting material facts upon which he relied in lifting certain restrictions on stock in furtherance of defendant's scheme to defraud. In fact, attorney Hariton responded "yes" to the ultimate question: "Did you ever think that you were being lied to or misrepresented to?" (Hariton at 126, lines 14-16). This testimony alone warrants application of the crime-fraud exception to the attorney-client privilege.

As detailed herein, defendants' misrepresentations to attorney Hariton (all of which were in furtherance of their scheme to defraud) include that: (a) the Company was in good standing when it was not and, in fact, was "void," (b) defendants and other "insiders" were not affiliates when they were, (c) the shares of former stockholders were being acquired by the Company to be

---

[1] We direct the Court to the fact that all of the testimony that supports the instant motion was given by defendants themselves and the Company's former attorney, Frank Hariton, Esq. Their own sworn statements (and nothing else) requires a finding of the crime-fraud exception to the attorney-client privilege.

retired when, in fact, the Company was misleading these non-parties (including Christopher Francis) so that they could put free-trading shares into the hands of its affiliates and insiders, and (d) the transactions were legitimate when, in fact, the Company was permitting restrictions to be lifted on shares of stock so that the Company's co-conspirators, John Brady, Ed McPhee and others could use the stock as "currency" for the Company in furtherance of the fraud. Indeed, the transferees of the stock in these fraudulent transactions (e.g., Brady, Ed McPhee, Robert Schanz and Larry Dobroff) all misrepresented their status in writing to attorney Hariton so that they could receive these free-trading shares and make millions of dollars to the detriment of plaintiffs and other shareholders.

Based on the foregoing, plaintiffs are entitled to discovery of the communications between the Company and attorney Hariton.

## STATEMENT OF FACTS[2]

### 1.     Complaint

As alleged in the Second Amended Complaint herein (the "Complaint"), defendants, in clear violation of SEC rules and in furtherance of their scheme to defraud, arranged to have restrictions lifted that were placed on many shares of Company stock so that certain "match orders" could be made and, inter alia, the Company could put free-trading shares in the hands of its co-conspirators.[3] John Brady, one such conspirator, has already admitted in sworn testimony that he received and used a large amount of the Company's free-trading shares as "currency" to help grow and build the Company and induce people's involvement in the Company. (See deposition of John Brady, taken on October 19 and October 20, 2006 ("Brady Dep"), at p. 377, lines 12-15, a copy of the relevant portions of which is annexed to the Barbaro Cert. as Ex. "B").

---

[2] The documents referenced herein are annexed to the accompanying Certification of Nicole V. Barbaro dated October 12, 2007 (the "Barbaro Cert.").

[3] See the Complaint, a copy of which is annexed to the Barbaro Cert. as ("Ex.")"A", at ¶¶ 33-35)

231596                                                    3

### 2.     Attorney Hariton's Representation of the Company

Mr. Hariton, a securities lawyer with 30 years of experience, (Hariton at[4] p. 11, lines 12-19) provided legal services to the Company, for the period September 2003 through spring of 2004. (Hariton at p. 10, lines 6-11). Among the legal services that he provided was the issuance of opinion letters to transfer agents regarding the transferability of shares. (Hariton at p. 12, lines 21-21).[5]  This would require an opinion as to both the status of the transferor and the transferee. Hariton would render these opinions based on the information available to him and the representations made to him.

### A.     The Status of the Transferor of Shares

In the event that a transferor/shareholder held shares that were restricted, Hariton would determine, pursuant to the "facts and circumstances," whether it was appropriate to issue an opinion letter stating that it was permissible to transfer the restricted shares notwithstanding a restrictive legend that might appear on the certificate or "stop transfer instructions" that the shares might be maintaining. (Hariton at p. 13, lines 18-25).  In determining the "facts and circumstances," Hariton would consult the agreements pursuant to which the shares were issued. (Hariton at p. 14, lines 2-6). Moreover, Hariton would base his determination on representations made to him by the transferor of the stock. If, on their face, the representations appeared to entitle the shares to exemption, Hariton would notify the Company that he was prepared to issue

---

[4] References to "Hariton at __ " refer to the transcript of the deposition of Frank Hariton, Esq. (with exhibits annexed thereto), taken on October 1, 2007, a copy of which is annexed to the Barbaro Cert. as Ex. "C."

[5] In several instances during his deposition, defendant Edward McPhee (the CEO's brother and allegedly not a corporate officer) testified to opinion letters written by attorney Hariton on behalf of the Company.  (See e.g., deposition of Edward McPhee, taken on July 6, 2007 ("Ed McPhee Dep.") at pp. 94 and 108, a copy of the relevant portions of which is annexed to the Barbaro Cert. as Ex. "D").

231596

4

an opinion letter absent any contrary opinions or facts set forth by the Company.  (Hariton at p. 14, lines 13-20).

**B.      Misrepresentations Concerning the Transferees of the Shares and Affiliate Status**

Under the securities laws, free trading shares cannot be transferred to an individual with "affiliate" status in a company.  See Rule 144 of the Securities Act of 1933 as amended.  Hariton testified that "[o]fficers and directors are deemed to be affiliates.  Significant shareholders may be affiliates.[6]  There's a question of fact." (Hariton at p. 19, lines 2-6).  "If you're filling the functions of an officer, it would tend to make you an affiliate . . . that would certainly be a factor." (Hariton at p. 20, lines 6-11).  In response to whether he, as an attorney, must make the factual determination as to the affiliate status of an individual, Mr. Hariton replied that he is "entitled to rely on [his] client when [his] client says he's not an affiliate." (Hariton at p. 21, lines 4-6).

As set forth below in detail, time and again throughout his deposition, Hariton testified that he was never made aware of the specific positions of certain individuals in the Company that, more often then not, would have deemed them affiliates.    Indeed, under separate subheadings below, plaintiffs illustrate the misrepresentations concerning Robert Schanz, Ed McPhee, John Brady and Larry Dobroff.

**3.      Misrepresentations Concerning the Chris Francis Transaction**

As this Court will recall, plaintiffs alleged in the Complaint that, as a result of a series of misrepresentations made by defendants, Christopher Francis, a then shareholder of the Company, sold 8.5 million shares of free-trading stock to defendants for a price of .001 cent per share in exchange for an alleged release of all claims against Francis and an indemnification agreement

---

[6] Plaintiffs have established herein that John Brady and Ed McPhee were both significant shareholders by virtue of the fact that they received of 3.5 million shares each in the Francis transaction .  Indeed, they both testified that the acquired shares from other sources as well.

231596                                                        5

from the Company. (<u>See</u> Ex. A at ¶ 29). This transaction was unlawful because it was induced by fraud, placing millions of unrestricted shares in the hands of affiliates and insiders who profited and also used the shares as currency for the Company. In his affidavit, Francis testifies to Mr. Hariton's role as acting as escrow agent in the transfer of Francis's shares (<u>see</u> affidavit of Christopher Francis, sworn to October 25, 2006, at ¶ 5-7, a copy of which is annexed to the Barbaro Cert. at Ex. "E"). In the first instance, defendants lied to Francis by telling him that they intended to retire the shares to help the Company, which shares were worthless anyway. (<u>Id.</u> at ¶¶ 2-9). Instead, Francis's shares were transferred to Schanz (1 million shares), Ed McPhee (3.5 million shares) and Brady (3.5 million shares) based on the following misrepresentations:

Hariton testified that he was not made aware that Schanz was a chairman of the Company's advisory board, that such a position may be considered that of an affiliate (Hariton at p. 63, lines 19-22), that this information would have been something that he would have wanted to look into (Hariton at p. 63, lines 23-25), and that he is bothered that he was not made aware of it (Hariton at p. 115, lines 24-end). Hariton further testified that, with respect to the transactions involving Schanz, which are discussed fully below, by virtue of defendants' misrepresentations and omissions, he was deprived of the opportunity to investigate, and it was possible that he would not have issued opinion letters had he received full disclosure. (Hariton at p. 114, lines 5-18).

Similarly, Hariton testified that he did not know that Ed McPhee was a stockbroker or even his affiliation with the Company – only that he was Dan McPhee's brother. (Hariton at p. 40, lines 24-end; p. 41, lines 1-9). Hariton recalled that Ed was a "party to certain agreements" and a "party to an agreement with the company that . . . entitled him to shares of stock." (Hariton at p. 41, lines 13-16). Hariton testified that he received representation from Ed McPhee that he

was not an affiliate. (Hariton at p. 101, lines 21-24). Hariton had no idea that Ed McPhee was using his shares as "currency" as set forth below.

When discussing transactions involving defendant John Brady, Hariton testified that he was never told anything about what John Brady's position was in the Company and that it would seem "in the normal course" that he would have asked. (Hariton at p. 102, lines 16-19, 22-23). However, he testified that Brady represented to him that he was not an affiliate. (Hariton at p. 101, lines 21-24). Finally, when told that plaintiffs allege that Brady was the promoter of the Company, Hariton testified that it would have been "important" to know if Brady was meeting with people to try and get investors for the Company and holding himself out as the person who controlled the Company. (Hariton at p. 94, lines 20-end, p. 95, lines 2-3). Dan McPhee and Brady have admitted that Brady was doing this (see, e.g., deposition of Dan McPhee, taken on November 21, 2006, "D. McPhee" at p. 41, lines 24-25, p. 42, line 2, p. 46 lines 13-14, a copy of the relevant portions of which are annexed to the Barbaro Cert. as Ex. "F"; Ex. "B" at p. 82, line 21, p. 93, lines 5-8, p 101, lines 8-10, p. 145, lines 13-14.[7])

Hariton consistently testified that, with regard to all transferees, they would have had to make written representations that they were not affiliates or otherwise ineligible. (Hariton at p. 48, lines 14-20).

Based on the foregoing, Hariton issued opinion letters, including two dated October 7 and October 9, 2003, in connection with this transaction, which authorized the transfer of 4.25

---

[7] Among other things that John Brady was doing for the Company, both Dan McPhee and John Brady testified that Brady was: (a) introducing people willing to finance the Company (Ex. "F" at p. 41, line 25, p.42, line 2; p. 46, line 13-14), (b) bringing in strategic business relationships to the Company (Ex. "F" at p. 41, line 24; p. 42, line 2), (c) assisting the Company in preparing and having advanced access to the Company's press releases (Ex. "F" at p. 12, lines 18-21; p. 14, lines 20-25), (d) communicating daily with the Company (Ex. "B" at p. 159, lines 13-14), (e) suggesting the formation of the Board of Advisors (Ex. "B" at p. 159, line 9-12), (f) participating in the development of the business plan (Ex. "B" at p. 145, lines 17-19, p. 93, line 5-8), and (g) recruiting key advisors to the board of advisors (Ex. "F" at p. 12 line 18-21).

million shares of Chris Francis's to transferees Robert Schanz, Ed McPhee and John Brady. (Ex. "J") As stated above, despite the fact that they likely held affiliate status, Hariton testified that no one ever disclosed to him the positions of Schanz, Ed McPhee and John Brady in the Company. Indeed, when asked about the statement that "[he had] received appropriate representations," which appears in both letters, Hariton testified that he would have received the "appropriate representations" from the transferees in order to issue said opinion letters. (Hariton at p. 48, lines 11-14). In particular, the transferees would have "had to have signed a letter saying that they were acquiring shares with investment intent, not as part of a distribution[,] that they weren't affiliates of the company, there might have been a laundry list of representations that they would have had to make." (Hariton at p. 48, 14-20) (emphasis added).

The October 7th letter instructed that said shares were restricted and subject to "stop transfer instructions" while the October 9th letter "modified" said instructions in the October 7th letter to state that the shares would not be restricted and/or subject to stop transfer instructions. When asked about the basis for his modification in lifting said restrictions placed on the shares in the instructions of the October 7th letter, Hariton testified that Schanz, Ed McPhee and John Brady must have "made some representation which satisfied [Hariton] that they were not [affiliates]" because "those shares would in effect become restricted again if an affiliate acquired them." (Hariton at p. 53, lines 8-12). Hariton also testified that he was not aware that Schanz was active in soliciting other people to join on the Company's board and that it would have possibly affected whether or not he would have permitted the restrictions to be lifted. (Hariton at p. 88, lines 6-15). With regard to Brady, Hariton testified that his receiving an aggregate 3.5 million shares of free trading stock would never have occurred if he was an affiliate. (Hariton at p. 101, lines 14-20). As more fully set forth below, Hariton certainly would not have allowed it

if he knew that Brady was receiving the shares to be used as "currency" for the Company (Hariton at pp. 98-99).

Thus, the transfer of Francis's shares was the result of misrepresentations made to Hariton, because the true statuses of transferees Schanz, Ed McPhee and Brady – likely affiliates of the Company -- were not disclosed to Hariton.

### 4.    Misrepresentations Concerning the Company's Good Standing Status

Contrary to defendants' representations to Hariton, the Company was no longer in existence or in good standing and was void at all relevant times, including during the time period in which Hariton represented the Company.  (See Certificate and Renewal and Revival of Character annexed to the Barbaro Cert. as Ex."G.")  Delaware's Secretary of State declared the reason for the Company's status as void and no longer in existence as "non-payment of taxes." (See Ex. "G" to Barbaro Cert.)[8]  The fact that Hariton was not advised of the Company's true status is evidenced in several opinion letters issued by him wherein he plainly states that "[t]he Company is duly organized, validly existing and in good standing under the laws of the State of Delaware," (see e.g., opinion letters dated January 20, 2004 and February 28, 2004, annexed as Ex "I" to Barbaro Cert.)  Indeed, Hariton testified that, on more than one occasion, it was represented to him that the Company was in good standing (Hariton at p. 123, lines 22-end; p. 124, lines 2-3) and that he would not state that a company was in good standing when it was not. (Hariton at p. 37, lines 24-end; p. 38, lines 1-4).  Hariton testified that, if the Company was indeed "void" at the time during which he represented it, that would have made it "not in good standing." (Hariton at p. 55, lines 13-18).

Further, if the Company was void until July 2004, Hariton testified that his statement in the February 28th letter would have been inaccurate.  (Hariton at p. 110, lines 14-18).  When

---

[8] In fact, as of March 1, 2007 (and still today) the Company is non-existent and void.  See the Delaware state records annexed to the Barbaro Cert. as Ex. "H."

231596                                                                                          9

asked whether he received representations to the contrary regarding the Company's good standing when issuing this opinion he testified that "[t]he opinion speaks for itself. It's not [his] practice to just write those words. [He] had something to the contrary or [he] would not have written those words." (Hariton at p. 110, lines 20-end). Such representations would have been false when made. (Hariton at p. 111, lines 5-7).

Further, the Company cannot now deny that it had knowledge of its lack of good standing and its void status because Dan McPhee, its then President and CEO, applied for the Renewal and Revival of the Company's Character on July 1, 2004, together with which he submitted a sworn statement acknowledging the foregoing. (See Ex. "G" to the Barbaro Cert).[9]

In his deposition, Hariton acknowledged that the Company once again issued 200,000 shares when it was not in good standing (Hariton at p. 124, lines 5-12) and that doing so raises a red flag. (Hariton at p. 124, lines 20-23). It is becoming more and more evident that defendants ignored all legal requirements and did whatever they wanted to perpetrate their fraudulent scheme.

### 5. Further Misrepresentations Concerning John Brady and his Use of the Company's Stock as "Currency"

As this Court is aware, defendant John Brady testified to receiving and using a large amount of the Company's free-trading stock as "currency" to induce people's involvement in the Company. (See Ex. "B" at p. 377, lines 12-15). Brady admitted to specific instances of using the stock as currency in transferring 400,000 shares to Bernard Kerik to become a member of the Board of Advisors of the Company at Dan McPhee's request (Exhibit "B" at p. 164, lines 5-15), additional shares to Scott Vining to join the Board of Advisors of the Company (Ex. "B" at p. 166, lines 17-25) and possibly 100,000 shares to Joe DiRenzo to have his father join the Board

---

[9] In fact, knowing that the Company lacked good standing and was non-existent and void, Dan McPhee and other defendants made at least 6 filings with the Securities and Exchange Commission without disclosing the Company's status.

of Advisors of the Company (Ex. "B" at p. 205 lines 17-25). By extension, in addition to the

Francis shares that he received, it is likely that other restricted shares became the source of such

"currency" as well.

When told about Brady's testimony that he had "a large amount of free trading shares

that could be used as currency to help grow and build the company" and then when asked about

his familiarity, as a securities lawyer, with the concept of someone using free trading shares as

currency to build a company, Hariton stated that he "hear[s] those words, they never make [him]

happy." (Hariton at p. 98, lines 9-17). Hariton further testified that

> Q.    Can you explain that to me?
>
> A.    I think, and I don't know all the circumstances, but as a
>        general case it sounds like the person is going to sell the
>        shares for the benefit of Company, and if the company
>        were to sell the shares there would have to be a registration
>        statement.    So it sounds like something that has an
>        appearance of seeking to evade the securities laws.
>
> Q.    Would that also be the case if they were going to use – if
>        they had been made the repository of these free trading
>        shares to perhaps entice others' involvement in the
>        company, would that be similarly as an attempt to evade
>        these securities laws?
>
> A.    It would sound like something that is not proper and
>        probably not legal.

(Hariton at p. 98, lines 18-end; p. 99, lines 2-11).

Hariton testified that no one ever told him that Brady planned to use the shares as

currency. (Hariton at p. 99, lines 17-21; p. 101, lines 25-end; p. 102, lines 2-4). He also testified

that he would have wanted to know such information, and that "it may have mattered" and that

"after inquiry [he] may have ceased [his] representation of the company." (Hariton at p. 99, lines

22-end; p. 100, lines 2-4).

In fact, Hariton testified that, out of the misrepresentations and omissions that occurred, what "cause[d] him the grave [sic] concern" was that someone was using the shares that they received as currency. (Hariton at p. 113, lines 21-24). Specifically, Hariton stated that "someone out there saying . . . I had shares for currency, I wish I had known." (Hariton at p. 114, lines 3-4) (emphasis added).

### 6.     **Further Misrepresentations Concerning the Robert Schanz Transactions**

Hariton's legal services were again utilized by the Company in the transfer of 600,000 shares of the Company's stock to Schanz via his company SMG Marketing Group Inc. ("SMG"), as a fee pursuant to an alleged consulting agreement allegedly in September 2001, when in fact it entered into the agreement in November 2003 - the date at which it asked Hariton to issue an opinion letter regarding said shares. In a letter dated January 20, 2004, Hariton issued an opinion to the transfer agent of the Company relating to the issuance of shares in accordance with the terms of a consulting agreement (Hariton at p. 53, lines 20-25) for services of Mr. Schanz's Company, SMG Marketing Group, Inc. (Hariton at p. 54, lines 4-7). The letter indicates SMG's address to be "c/o Robert T. Schanz." As stated above, Hariton testified that he did not believe that Schanz was an affiliate of the Company. (Hariton at p. 44, 10-11). Hariton never knew the truth.

The end result is that SMG received 600,000 free-trading shares. (Hariton at p. 54, lines 7-8). Hariton testified that he presumed that he was aware that SMG was Schanz's Company. (Hariton at p. 54, lines 12-14). Hariton testified that the Company claimed that it had promised the shares to SMG three years ago but they never gave them to him. (Hariton at p. 57, lines 21-24). Hariton added that the Company claimed that at that time, the "ministerial act of [writing] the opinion was not done." (Hariton at p. 56, lines 5-9). Hariton testified that "with the benefit of hindsight", he would have questioned the truth of whether the Company promised this stock

three years before the Company asked him to render this opinion. (Hariton at p. 58, lines 10-14). Moreover, Hariton testified that, in rendering his opinion, he was at the mercy of what the Company represented to him concerning the consulting agreement because this happened well before he even met these people. (Hariton at p. 59, lines 12-16). Hariton also testified that if he had found out that the agreement was dated November 2003 as opposed to November 2001, then it would have changed his opinion. (Hariton at p. 68, lines 4-7). Hariton further testified that, with the benefit of hindsight, he would have questioned whether Schanz truly held this stock for the number of years stated. (Hariton at p. 66, lines16-20).

In all, Hariton admitted that he was instructed to render opinions on transfers that placed in the hands of Schanz a total of 2 million free-trading shares as evidenced in Exhibits 2, 3, 10 and 11 to the Hariton deposition. (Hariton at p. 89 lines 22-end; p. 90, lines 2-6 and the exhibits annexed thereto). Again, Hariton reiterated that he was never told that Schanz in fact, was the chairman of the Company's advisory board. (Hariton at p. 91, lines 10-12). Hariton further testified that, with the benefit of hindsight, he sees a problem with permitting the transfer of 2 million shares of free-trading stock into the hands of the chairman of the advisory board in a matter of a few months. (Hariton at p. 91, lines 4-9). He further testified that he was not aware that Schanz, in fact, was chairman of the advisory board but that that would have been information he would have wanted to know because it would "raise questions because [he] would have to inquire whether being chairman of the advisory board of the subsidiary made him an affiliate of the parent." (Hariton at p. 66, lines 8-15; p 86, lines 15-25; p. 87, lines 2-5). Indeed, Hariton testified that his opinion letters state that Schanz was not an affiliate. (Hariton at p. 65, lines 21-24; p. 89, lines 18-21), Hariton testified that he only recalls that Schanz was a creditor of the Company who received shares in settlement of a claim against the Company (Hariton at p. 42, lines 15-20; p. 43, lines 2-5).

In sum, Hariton testified that, with respect to the transactions involving Schanz, among other things, by virtue of the misrepresentations and omissions, he was deprived of the opportunity to investigate, and that it was possible that he would not have issued opinion letters had he received full disclosure. (Hariton at p. 114, lines 5-18). Hariton ultimately testified that he is bothered that Schanz had some role in an advisory committee for the subsidiary. (Hariton at p. 115, lines 24-end).

### 7. Misrepresentations Concerning Larry Dobroff

Hariton issued an opinion letter dated November 5, 2003, concerning the issuance of 750,000 shares to Larry Dobroff, among others, declaring that Dobroff is "not [an] affiliate of the Company." Hariton testified that he based this statement on the representations that he received from the Company that Dobroff was not an affiliate. (Hariton at p. 85, lines 24-end, p. 86, line 2). In contrast, Dan McPhee testified in this case that Dobroff was an "insider" of the Company (Ex. "F" at p. 8 line 5-21).

Hariton testified that no one in the Company represented to him that Dobroff actually held titles in the Company. (Hariton at p. 85, lines 3-9) Specifically, no one told Hariton that Dobroff joined the management team as vice president of finance. (Hariton at p. 85, lines 11-13). He did testify that Dobroff may have been a de facto CFO. (Hariton at p.79, lines 6-8). Hariton testified that this would have been information that he would have liked to have known when he issued his opinion. (Hariton at p. 85, lines 10-12). In fact, it was represented to Hariton that Dobroff was not an affiliate. (Hariton at p. 85, lines 24-end, p. 86, line 2). Again, in this case, Dan McPhee testified that Dobroff orchestrated the Francis transaction. (Ex. "F" at p. 65, line 16-19).

### 8. Further Misrepresentations Concerning Edward McPhee

Hariton testified that Ed McPhee received an aggregate amount in excess of 3.5 million free trading shares. (Hariton at p. 101, lines 8-11). Hariton testified that Ed would not have received these free trading shares if Ed was an affiliate. (Hariton at p. 101, lines 17-20).[10] Hariton further testified that he was never told anything about what Ed's position was in the Company and that it would seem "in the normal course" that he would have asked. (Hariton at p. p. 102, lines 16-19, p. 22-23).

In sum, Hariton testified that, with respect to, among other things, the Ed McPhee transactions, by virtue of the misrepresentations and omissions, he was deprived of the opportunity to investigate and that it was possible that he would not have issued opinion letters had he received full disclosure. (Hariton at p. 114, lines 5-18).

### 9.    **Further Misrepresentations Generally**

Hariton testified that, during his representation of the Company, he was being lied to or misrepresented (Hariton at p. 126, lines 14-16) and that there came a time when he felt uneasy about preparing opinion letters for the Company. (Hariton at p. 125, lines 11-13). Hariton testified that he would expect a company to confirm or correct facts that are inaccurately given to him by someone if the company is aware of it. (Hariton at p. 68, lines 11-15). When asked whether he was beginning to see a pattern of omissions as they culled through the documents during the deposition, Hariton responded "[i]t's starting to look a little that way." (Hariton at p. 87, lines 6-12).

---

[10] In fact, Ed McPhee also was using the shares as currency: (a) he transferred 100,000 to Don DiRenzo to join the board of advisors of the Company (Ex. "D" at p. 44, lines 19-25; Ex. "F"at p. 203) (b) he transferred shares to Angela DiRenzo, Don DiRenzo's daughter in law in consideration for Don joining the Board (Ex. "D" at p. 45 line 1-6; Ex. "F" at p. 206) and, (c) he transferred 100,000 shares to Rosenthal & Rosenthal, who was a creditor of the Company to settle some of the Company's debt (Ex. "D" at p 44, line 2-6). The most glaring example of Ed McPhee using the shares as currency relates to his sale of stock in September and October 2003. Shortly thereafter, Ed McPhee provided the Company with $50,000 to pay the finder's fee on behalf of the Company for getting Bernard Kerik to serve on the Board of Advisors, because the Company did not have the money (Ex. "B" at p. 271, lines 19-20; p. 275, line 8-19).

15

Hariton, again, testified (toward the end of his deposition) about the misrepresentations

and omissions:

> Q.    As we go through these documents is it becoming clearer
>        that misrepresentations were made to you in connection
>        with these opinion letters you were asked to do?
>
> A.    The possibility is certainly growing. (102 lines 11-15)

Mr. Hariton also admitted that, had he known the truth at the time he was rendering his

opinion, he would have been able to make a determination and "done [his] job." (Hariton at p.

116, lines 10-17).

> Q.    But because you weren't told when you should have been
>        told. That's the purpose of our examination today. That's
>        right, you and I can't decide now, but had you known at the
>        time you could have done your job.
>
> ***
>
> Q.    Isn't that correct?
>
> A.    That's correct.
>
> Q.    That's why you have to have representations and
>        disclosures contemporaneously, correct?
>
> A.    Yes.
>
> Q.    Telling you five years later doesn't help?
>
> A.    No.

(Hariton at p. 116, lines 10-24)

With respect to the Company's knowledge of the content of the opinion letters issued by

Hariton, he testified that the Company, specifically Dan McPhee, received copies of his opinion

letters (Hariton at p. 68, lines 22-end; p. 69, lines 1-3) and that it is his "normal practice

whenever [he] issue[s] opinions to transfer agents . . . that the client [receive the opinion letter]."

(Hariton at p. 68, line 25–end; p. 69, lines 1-3).

After years of stalling by the defendants, plaintiffs can now finally connect the dots in defendants fraudulent scheme. We now know that defendants not only lied to plaintiffs, but they lied to the Company's lawyer. Further discovery is required so that defendants, at long last, may be held accountable.

**ARGUMENT**

In furtherance of their scheme to defraud, defendants utilized the legal services of attorney Hariton. As such, Hariton's communications with defendants regarding these representations should not be protected by the attorney-client privilege.

### 1.    The Crime-Fraud-Tort Standard

Courts have consistently held that the attorney-client privilege "may give way to strong public policy considerations and may not be invoked where it involves client communications that may have been in furtherance of a fraudulent scheme, an alleged breach of fiduciary duty or an accusation of some other wrongful conduct." Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker, 1 A.D.3d 223, 224, 767 N.Y.S.2d 228, 228 (1st Dep't 2003) (exception to attorney-client privilege warranted where fraud was attempted or committed and communications were made in furtherance thereof) (internal citations omitted). See Shahinian v. Tankian, 242 F.R.D. 255 (S.D.N.Y. 2007) (crime-fraud exception to attorney-client privilege warranted where communications likely to be in furtherance of crime and for purpose of committing or facilitating crime or fraud); Antidote Int'l Films, Inc. v. Bloomsbury Publishing, PLC, 242 F.R.D. 248 (S.D.N.Y. 2007) (communication not protected by attorney-client privilege because was in furtherance of an attempted fraud); Surgical Design Co. v. Correa, 284 A.D.2d 528, 529, 727 N.Y.S.2d 462, 463 (2d Dep't 2001) (attorney-client privilege did not protect client communications made in furtherance of fraudulent scheme); People v. Doe, 99 Misc. 2d 41, 416,

416 N.Y.S.2d 466, 470 (Sup. Ct. Queens Co. 1979) (noting attorney-client privilege does not attach to communications made for the purpose of committing a crime or tort).

Further, an attorney need not be aware that his or her services were retained for fraudulent or illegal purposes in order for the crime/fraud/tort exception to apply. In re Grand Jury Subpoena of Stewart, 144 Misc. 2d 1012, 1020, 545 N.Y.S.2d 974, 979 (Sup. Ct. N.Y. Co.), aff'd as modified, 156 A.D.2d 294 (1st Dep't 1989). Plaintiffs herein have presented indisputable evidence of the fact that defendants lied to the Company's lawyer in furtherance of their fraudulent scheme.

## 2.    **In Furtherance of Illegal Transfers**

### A.    *The Fraud of "Matched Offers"*

In the first instance, Hariton's legal services were used by the Company to facilitate unlawful "matched offers." Specifically, among other things, in his issuance of the October 7, 2003 and October 9, 2003 opinion letters, Hariton authorized the transaction involving Chris Francis's transfer of 4.5 million shares to defendants for the set price of .001 cent per share in exchange for an alleged release of claims against Francis, which constitutes an arranged or "matched order" in violation of the securities laws. [11]

### B.    *The Fraud of Issuing Free-Trading Shares to Affiliates*

In furtherance of their scheme to defraud, defendants, via the legal services provided by Hariton, arranged to have restrictions lifted that were placed on many shares of Company stock so that the Company could put free-trading shares in the hands of its co-conspirators. All of this was in clear violation of SEC rules. (See Ex. "A" at ¶¶ 33-35). Specifically, as the Company's

---

[11] The remaining 4.25 million of the Francis shares were also transferred to John Brady and Ed McPhee.

counsel, Hariton was involved in issuing opinion letters[12] and otherwise facilitating the Company in its issuance of free-trading shares based on the plethora of misrepresentations made by the Company to him. These misrepresentations most notably included Ed McPhee's, Schanz's, Dobroff's and Brady's failure to disclose their true affiliate status within the Company and instead, making written representations to the contrary, so that they would be able to receive Chris Francis's restricted shares. Thus, Hariton's legal services were used to further two frauds: first, the status of the transfer as a "matched offer" and second, the transfer of restricted shares to affiliates of the Company.

Accordingly, Hariton's testimony concerning his communications with defendants regarding these representations should not be shielded by the attorney-client privilege because such communications aided defendants' fraudulent scheme.[13]

### 3.    The Fraud Concerning the Company's "Good Standing"

Defendants' communications with Hariton are again implicated in furthering their scheme to defraud because: (1) such communications permitted the Company to misrepresent itself as being in good standing when in fact, it was not; and (2) it permitted the Company to enter into illegal transactions based on this misrepresentation.

Documentary evidence shows that the Company was void and not in good standing at all relevant times in this litigation, including the time period during which Hariton provided the Company with representation. Indeed, Hariton testified repeatedly that the Company represented its status to him, on several occasions, as being in "good standing" and that he would never have

---

[12] See exhibits to Hariton Deposition annexed to Barbaro Cert. as Ex. "J."

[13] Mr. Hariton indicated that he refused to perform any further services in this regard because he seriously questioned the truth of the representations being made to him.

stated that a company was in good standing when in fact it was not. Further, the application for renewal filed by Dan McPhee (together with his sworn statement) is clear documentary evidence that the Company had knowledge of its lack of good standing and void status during all relevant time periods. Thus, the Company's communications with Hariton served as the basis for his falsely declaring in each and every opinion letter that the Company was "in good standing," when in fact it was not, which, in and of itself, is a fraud. Further, this misrepresentation of the Company's status served as the premise by which Hariton was able to authorize the illegal transactions discussed above. As such, the attorney-client privilege cannot serve to protect Hariton's communications with the Company.

### 4.     The Fraud of Using the Company's Stock as "Currency"

This is the biggest fraud! In furtherance of their scheme to defraud, defendants, via Hariton's legal services, were able to acquire and use a large amount of the Company's free-trading stock as "currency" to induce involvement in the Company. Defendant's Brady, Dan and Ed McPhee have all admitted that he did as much, and Hariton recognized such conduct as not only "not proper and probably not legal" but that which caused him the "grave[est] concern" out of all the misrepresentations and omissions that occurred.

As such, because Mr. Hariton's communications with defendants concerning his services were in furtherance of defendants' scheme to defraud, testimony concerning the content of such communications is exempted from the attorney-client privilege.

## CONCLUSION

For the foregoing reasons, the Court should issue an order: (a) granting disclosure of the communications between the Company and its former attorney, Frank Hariton (b) granting additional examinations of Dan McPhee, Ed McPhee and John Brady concerning their communications with attorney Hariton, and (c) granting such other and further relief as is just and proper.

Dated: New York, New York
        October 12, 2007

                                      TODTMAN, NACHAMIE, SPIZZ
                                      & JOHNS, P.C.
                                      *Attorneys for Plaintiffs*

                              By: _____
                                      Richard S. Ciacci (RC-0167)
                                      Nicole V. Barbaro (NB-3422)
                                      425 Park Avenue
                                      New York, New York 10020
                                      (212) 754-9400