UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

JAY DEES INC., PHILLIP MARKS,
STEPHEN KEVELSON, JOHN SCOTTO,
and JOHN DOES 1-10,

          **Plaintiffs,**

   - against -

DEFENSE TECHNOLOGY SYSTEMS,
INC., JOHN BRADY, EDWARD McPHEE,
and DANIEL McPHEE,

          **Defendants.**

-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/25/08

**OPINION AND ORDER**

05 Civ. 6954 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Investors in Defense Technology Systems, Inc. ("Defense Tech") are

suing the company and its leadership for alleged securities fraud, including

misrepresentations concerning company finances, capabilities, and prospects,

compounded by illegal stock sales by individual defendants. Specifically,

plaintiffs allege violations of section 10(b) of the Securities Exchange Act of

1

1934[1] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"),[2] as well as common-law fraud. Plaintiffs claim that individual defendants are jointly and severally liable for frauds perpetrated by the company as control persons under section 20(a) of the 1934 Act.[3]

On January 3, 2006, this Court granted defendants' motion to dismiss plaintiffs' First Amended Complaint, albeit with leave to replead.[4] Plaintiffs' Second Amended Complaint survived a motion to dismiss on June 20, 2006.[5] Defendants now move for summary judgment on all claims asserted in plaintiffs' Third Amended Complaint. Plaintiffs cross-move for summary judgment on Defense Tech's counterclaims for contribution and indemnification. Defendants neither confirm nor deny the validity of the purported misrepresentations; rather

---

[1]    15 U.S.C. § 78j(b).

[2]    17 C.F.R. § 240.10(b)(5).

[3]    15 U.S.C. § 78t(a).

[4]    *See Catton v. Defense Tech. Sys., Inc.* ("*Catton I*"), No. 05 Civ. 6954, 2006 WL 27470 (S.D.N.Y. Jan. 3, 2006).

[5]    *See Catton v. Defense Tech. Sys., Inc.* ("*Catton II*"), 457 F. Supp. 2d 374 (S.D.N.Y. 2006). This Court also issued a written opinion allowing plaintiffs to depose attorney Frank Hariton concerning his communications with Defense Tech officials, based on the crime-fraud exception to the attorney-client privilege. *See Catton v. Defense Tech. Sys., Inc.* ("*Catton III*"), No. 05 Civ. 6954, 2007 WL 3406928 (S.D.N.Y. Nov. 15, 2007).

2

they question whether plaintiffs can prove other necessary elements of their fraud claim. For the reasons that follow, defendants' motion is denied, and plaintiffs' cross-motion is denied.

## II. FACTS

### A. Defense Tech

Defense Tech is a void Delaware corporation[6] that once claimed to have been a designer, developer, installer, and marketer of ballistics glass and related systems.[7] In various incarnations, Defense Tech has long been publicly listed in Pink Quote.[8] The company was incorporated as VTX Electronics Corp.

---

[6] *See* 10/1/07 Secretary of State Certification ("Secretary of State Cert."), Ex. H to 7/23/08 Certification of Nicole V. Barbaro, plaintiffs' attorney ("Barbaro Cert."). Under Delaware law a corporation may become void for failure to pay franchise taxes. A void corporation may not continue its principal business but may carry out activities essential to winding up. *See infra* Part III.E.

[7] *See* 7/16/08 Affidavit of Plaintiff John Scotto ("Scotto Aff.") ¶¶ 4, 7. Because defendants' statement of undisputed facts did not address plaintiffs' core allegations, plaintiffs did not describe the misrepresentations and omissions in their opposition submission. These facts are detailed in Scotto's affidavit, along with citations to evidence as required by Local Rule 56.1.

[8] *See* Affidavit of Eric S. Hutner, defendants' attorney ("Hutner Aff."), ¶ 3. "[C]ompanies quoted in the Pink Quote tend to be closely held, extremely small and/or thinly traded. Most do not meet the minimum listing requirements for trading on a national securities exchange, such as the New York Stock Exchange or the NASDAQ Stock Market." U.S. Securities & Exchange Comm'n, *Pink Sheets*, www.sec.gov/answers/pink.htm. Pink Quote was previously known as the Pink Sheets. *See id.* Defense Tech was also briefly traded on the OTC

3

on July 13, 1986 and was merged with Dataworld Solutions, Inc. on April 13, 1999.[9] On July 8, 2004, the corporation amended its certificate of incorporation to take its current name.[10]

During the time Defense Tech claimed to be a security technology firm, the company had no infrastructure, technological capacity, or in-house engineering or architectural personnel.[11] Nevertheless, the company publicly touted that it had an "in-house architect and engineering teams . . . who have over eighty (80) years of combined experience in the industry and defense field."[12] In fact, the company planned to contract these functions to other companies that had the requisite expertise. In one such example, Defense Tech touted its own purported capabilities by demonstrating the efficacy of ballistic glass

Bulletin Board. *See* Hutner Aff. ¶ 3. The OTC Bulletin Board is a more restricted exchange, requiring listed companies "to file updated financial reports with the SEC or with their banking or insurance regulators." U.S. Securities & Exchange Comm'n, *OTC Bulletin (OTCBB) Eligibility Rule*, www.sec.gov/answers/otcbbel.htm.

9      *See* Secretary of State Cert.

10     *See id.*

11     *See* Scotto Aff. ¶¶ 13-14.

12     *Id.* ¶ 13.

manufactured by a different company.[13] Similarly, the company's publicity materials provided a catalog of products that the company could not in fact design, craft, or install independently.[14]

Defense Tech also made a number of public claims regarding the state of its business and finances. Specifically, the company provided a substantial list of prestigious clients, albeit with the caveat that it did business with these clients "in association with our partners."[15] None of these purported clients had done business with Defense Tech; rather they had employed the company's potential subcontractors.[16] Defendants also privately misstated the amount of debt that Defense Tech had, along with the number of shares outstanding.[17] Finally, defendants continuously failed to submit required SEC filings including Forms 10-

---

[13]    *See id.* ¶ 15.

[14]    *See* Undated Publicity Brochure at 4, Ex. 16 to Third Amended Complaint, Ex. A. to Barbaro Cert. The brochure specifically states "our ballistics specialists and craftsmen will design, install and finish an impenetrable unit" and "DWS Defense Systems will then proceed to develop the appropriate products and systems and perform the installation." *Id.* Other claims expressly noted the inclusion of services provided by Defense Tech's "partners." *Id.*

[15]    *Id.* at 8.

[16]    Scotto Aff. ¶ 7.

[17]    *See id.* ¶ 4.

K and 10-Q.[18]

In 2003, defendant John Brady arranged for the sale of over one million shares owned by Ed Goodstein, who had owned VTX Electronics Corp. prior to the merger.[19] Specifically, Brady asked Goodstein to sell his shares on the public market as a block.[20] Defendant Dan McPhee arranged for sales restrictions to be removed from the stock,[21] but there is no indication in the record as to who purchased the stock.[22] Moreover, there is no evidence that this transaction altered the market's perception of the stock.

## B. Scotto's Investment and Reliance

Scotto was a major investor in Defense Tech as well as a substantial participant in its corporate activities.[23] In order to ascertain whether Scotto had in

---

[18] *See id.* ¶ 9.

[19] *See* 10/26/06 Affidavit of Edward Goodstein, Ex. F to Barbaro Cert.

[20] *See id.* ¶ 4.

[21] *See id.* ¶ 6. Previously the stock had been subject to a contractual restriction limiting the number of shares that could be sold per month. *See id.*

[22] Although plaintiffs assert in their brief that "defendants arranged these matched orders to obtain control of almost all of the Company's shares," Plaintiff's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment ("Pl. Opp. Mem.") at 14, they fail to cite evidence to support this proposition.

[23] *See* Defendants' Rule 56.1 Statement ("Def. 56.1") ¶¶ 6, 34-43.

fact sustained a loss as a result of his investment in Defense Tech, defendants conducted a thorough investigation of his brokerage records and tax returns.[24] Brokerage records obtained by subpoena indicate an investment of $134,460.02 in Defense Tech stock and a total return of $742,777.06, yielding a profit of $608,317.04.[25]

Scotto vociferously contests this calculation. He asserts that he suffered a substantial loss in an account at the now-defunct brokerage LH Ross, which would more than make up for the positive return in his other accounts.[26] To that effect, he has submitted a trading summary that indicates an investment of $731,552 and a return of $95,321, yielding a net loss of $636,201.[27] Although plaintiffs' attorney has attested that the document "is . . . John Scotto's LH Ross statement,"[28] there are no further submissions concerning its authenticity. Scotto claims to have discovered the LH Ross statement in a ski bag years after this litigation began and has been unable to locate any other document concerning his

---

[24]    *See id.* ¶ 3.

[25]    *See id.* ¶¶ 7-9.

[26]    *See* Scotto Aff. ¶¶ 22-23.

[27]    *See* 11/30/04 LH Ross Portfolio Evaluation, Ex. K to Barbaro Cert.

[28]    Barbaro Cert. at 2.

LH Ross account, despite claims that he traded hundreds of thousands of dollars with that brokerage.[29] Moreover, Sterne Agee – the clearing firm for LH Ross – has no record of an account in the name of John Scotto.[30] If the document were authentic, in combination with the profit made on other accounts, Scotto's total loss on his investment in Defense Tech would be $27,883.96. He also claims to have loaned Defense Tech significant amounts of money that remain unpaid.[31]

## C.  Jay Dees's Investment

Plaintiff Jay Dees Inc. is alleged to be a New Jersey corporation wholly owned by Harry Catton.[32] Jay Dees was a significant investor in Defense Tech and incurred a substantial loss in its trading activities. In the late summer and early fall of 2003, Jay Dees purchased $226,676.51worth of Defense Tech

---

[29]    *See* 5/14/08 Deposition of John Scotto ("Third Scotto Dep.") at 135-138, Ex. B to Hutner Aff.

[30]    *See* Hutner Aff. ¶ 10.

[31]    *See* Pl. Opp. Mem. at 24.

[32]    *See* Third Amended Complaint ¶ 12. In the first three iterations of the complaint, Harry Catton was named as an individual plaintiff. However, the Third Amended Complaint lists Jay Dees as the first named plaintiff. *See id.* Defendants correctly note that "the record is far from clear" concerning the ownership and management of Jay Dees, Def. Mem. at 2 n.2, but disputed facts must be construed in favor of the non-moving party.

8

stock,[33] and it made additional investments in April and August 2004 totaling $94,271.[34] This stock was sold on September 29, 2006 after it had lost nearly all of its value, yielding a loss of $311,647.22.[35]

On March 19, 2004, Catton signed a Verified Complaint ("the Verified Complaint") that alleged numerous violations of fiduciary duties by defendants Daniel and Edward McPhee as directors and executives of Defense Tech.[36] Specifically, the Verified Complaint stated that Dan McPhee had appropriated the corporation's assets for his own use, failed to excise proper care and oversight to maintain a functional business, failed to file financial returns, misrepresented the corporation's debt, and issued shares without consideration.[37] However – based on assurances by Dan McPhee that the company could and would be turned around – Catton did not file the Verified Complaint.[38]

Catton later stated in his deposition that by the date that he signed the

---

[33]    Def. 56.1 ¶¶ 11-12.

[34]    *Id.* ¶ 21.

[35]    *See* 10/13/06 Jay Dees's Oppenheimer & Co. Statement, Ex. H to Hutner Aff.

[36]    *See* 3/18/04 Verified Complaint, Ex. I to Hutner Aff.

[37]    *See id.* ¶¶ 21-22, 24-26, 29, 32.

[38]    *See* 7/16/08 Affidavit of Harry Catton ("Catton Aff.") ¶ 7.

9

Verified Complaint, he had become "aware of all the things that were addressed in the complaint in this case."[39] However, that broad generalization is contradicted by later assertions that Jay Dees continued holding Defense Tech stock after Catton signed the Verified Complaint based on assertions by the defendants "[t]hat there were many positive things happening" along with a string of positive press releases.[40] During the period between Catton's signing of the Verified Complaint and the day Jay Dees liquidated its investment in Defense Tech, shares in the company traded at or above Jay Dees's average per-share purchase price on twenty-four different days and at a significant volume.[41]

## D. Phillip Marks and Stephen Kevelson's Investment

Plaintiffs Phillip Marks and Stephen Kevelson also made significant

---

[39] 12/4/06 Deposition of Harry Catton at 266, Ex. C to Hutner Decl.

[40] 7/27/07 Deposition of Harry Catton at 316, Ex. M to Barbaro Cert. *Accord* 12/4/06 Deposition of Harry Catton at 116-118, Ex. M. to Barbaro Cert.; Catton Aff. ¶¶ 3-7.

[41] *See* Undated Dataworld/DFTS Stock Price Chart, Ex. I to Hutner Aff. Of course there is no way to determine what effect an attempt by Jay Dees to unload over half a million shares of Defense Tech would have had on the market. Moreover, Catton was in close communication with the other plaintiffs concerning his investment in Defense Tech, *see* Catton Aff. ¶ 7, and a joint decision by the named plaintiffs to liquidate their investment would certainly have affected the market.

investments in Defense Tech and incurred significant losses.[42] In making his

decision to buy the stock, Marks engaged in a single short discussion with Brady,

although he has not claimed that Brady made material misrepresentations during

that conversation.[43] Most of the information Marks relied upon came from

Scotto,[44] who engaged in frequent discussions with defendants.[45] Kevelson did not

engage in direct discussions with defendants,[46] although statements were made to

his son, who traded on his behalf.[47]

## E.    Voiding of Defense Technology Systems, Inc.

On March 1, 2002, Defense Tech – then known as Dataworld

Solutions Inc. – became inoperative and void under the laws of Delaware for

---

[42]    *See* 1/15/07 Review of Marks' Goldman Sachs Statements, Ex. H to
Hutner Aff. (establishing a net loss of $207,571.21 with 368,000 shares still held);
10/13/06 Kevelson Oppenheimer & Co. Statement, Ex. H to Hutner Aff.
(establishing a net loss of $298,764.97).

[43]    *See* Def. 56.1 ¶ 22.

[44]    *See* 6/22/07 Deposition of Phillip Marks, Ex. N to Barbaro Cert., at
150.

[45]    *See* Def. 56.1 ¶ 43.

[46]    *See id.* ¶ 25.

[47]    *See* Pl. Opp. 56.1 ¶ 25.

failure to pay franchise taxes.[48]  On July 1, 2004, Dan McPhee filed a certificate for Renewal and Revival of Charter, which revived the corporation retroactively effective as of February 28, 2002.  However, on March 1, 2007, Defense Tech again became inoperative and void for failure to pay franchise taxes.[49]  The governor's proclamation to that effect was issued on June 26, 2007.[50]  Defendants have conceded that Defense Tech is now dormant.[51]

## III.   LEGAL STANDARD

### A.    Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[52]  An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the

---

[48]    *See* 7/7/04 Certificate for Renewal and Revival of Charter, Ex. H to Barbaro Cert.

[49]    *See* Secretary of State Cert.

[50]    *See id.*

[51]    *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Cross-Motion for Summary Judgment Against DFTS' Counterclaims ("Def. Opp. Mem.") at 3.

[52]    Fed. R. Civ. P. 56(c).

nonmoving party.'"[53] A fact is material when it "'might affect the outcome of the suit under the governing law.'"[54] "It is the movant's burden to show that no genuine factual dispute exists."[55]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"[56] To do so, the non-moving party must do more than show that there is "'some metaphysical doubt as to the material

---

[53]     *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998)).

[54]     *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (quoting *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005)).

[55]     *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[56]     *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). *Accord In re September 11 Litig.*, No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug. 15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

facts,"[57] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[58] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[59]

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[60] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[61] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making

---

[57] *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[58] *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[59] *McClellan*, 439 F.3d at 144 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

[60] *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

[61] *McClellan*, 439 F.3d at 144 (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).

14

judgment appropriate as a matter of law."[62]

## B. Section 10(b) Claims

The Supreme Court recently laid out a concise enumeration of the

elements of a securities fraud claim under section 10(b) and rule 10b-5:

> In a typical § 10(b) private action a plaintiff must prove (1)
> a material misrepresentation or omission by the defendant;
> (2) scienter; (3) a connection between the
> misrepresentation or omission and the purchase or sale of
> a security; (4) reliance upon the misrepresentation or
> omission; (5) economic loss; and (6) loss causation.[63]

Four of these factors are at issue in this motion – material misrepresentation or

omission, connection to the purchase or sale of a security, reliance, and economic

loss. Each merits elaboration.

### 1. Material Misrepresentation or Omission

A material misrepresentation need not be a direct statement from

defendant to plaintiff. The creation of matched orders is one of many schemes by

which an individual may covertly insert material misrepresentations into the

securities market. "'Matched' orders are orders for the purchase sale of a security

---

[62]     *Karpova v. Snow*, 497 F.3d 262, 270 (2d Cir. 2007) (citing *Tocker v. Philip Morris Cos.*, 470 F.3d 481, 486-87 (2d Cir. 2006)).

[63]     *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, — U.S. —, 128 S. Ct. 761, 768 (2008) (citing *Dura Pharms. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security."[64] However not every matched order is unlawful. Rather, matched orders are prohibited only when they are "[f]or the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or a false or misleading appearance with respect to the market for any such security."[65] A typical scheme of unlawful matched orders is a pattern of numerous trades among a group of defendants that creates a false appearance of a bustling market.[66]

## 2. Connection to the Purchase or Sale of a Security

"[I]n order to bring an action for damages under § 10(b), the plaintiff must be an actual purchaser or seller of a security."[67] This bright-line rule excludes "shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities

---

[64]   *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 205 n.25 (1976).

[65]   15 U.S.C. § 78i(a)(1).

[66]   *See SEC v. Competitive Techs. Inc.*, No. 04 Civ. 1331, 2005 WL 1719725, at *6 (D. Conn. July 21, 2005).

[67]   *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730-31 (1975)).

in connection with the purchase or sale of securities which violate Rule 10b-5."[68]

Moreover, even if a plaintiff is a bona fide purchaser or seller, other elements of

the section 10(b) claim must also relate back to the purchase or sale of securities.[69]

Thus when proving a section 10(b) claim, an individual who dealt in a

corporation's stock may not include injuries resulting from other activities – such

as the extension of credit – in his calculation of economic loss.

## 3. Reliance

"Reliance provides the requisite causal connection between a

defendant's misrepresentation and a plaintiff's injury."[70] Reliance need not result

from direct communication from defendant to plaintiff. There is no reason why a

misrepresentation to the plaintiff's agent does not suffice; nor does deliberate use

of an intermediary sever the causal connection or render the principal a mere aider

or abettor.[71]

---

[68] *Blue Chip Stamps*, 421 U.S. at 738.

[69] *Cf. id.* (noting that such limitations can only be avoided via alternative mechanisms such as derivative actions). *See generally id.* at 737 (urging restraint in expansion of the private right of action under section 10(b)).

[70] *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988).

[71] *See Securities Investor Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 77 (2d Cir. 2000). Notably, there is no aider or abettor liability under section 10(b). *See Stoneridge Inv. Partners*, 128 S. Ct. at 767 (citing *Central Bank v. First Interstate Bank*, 511 U.S. 164, 191 (1994)).

At times the nature of the alleged fraud creates a rebuttable

presumption of reliance. In one such scenario – when a defendant had a duty to

disclose information to the plaintiff and omitted a material fact – it is presumed

that plaintiff relied on the defendant's silence.[72] Absent such a presumption,

plaintiffs must prove direct reliance, that "but for the claimed misrepresentations

or omissions, the plaintiff would not have entered into the detrimental securities

transaction."[73]

### 4. Economic Loss

Economic loss is not merely a failure to realize anticipated profits.[74]

Nor is the mere purchase of securities at an artificially inflated price sufficient to

demonstrate loss.[75] Rather, a plaintiff must prove that he did not recover his

capital investment.[76] In limited situations, loss may be based on the failure to

---

[72] *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54
(1972).

[73] *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343
F.3d 189, 197 (2d Cir. 2003). *Accord In re NYSE Specialists Sec. Litig.*, 503 F.3d
89, 103 (2d Cir. 2007).

[74] *See Commercial Union Assurance Co. v. Milken*, 17 F.3d 608, 613
(2d Cir. 1994).

[75] *See Dura*, 544 U.S. at 340.

[76] *See Commercial Union Assurance*, 17 F.3d at 613. Recovery of
capital investment may include an assessment of prejudgment interest, although

receive the "benefit of the bargain," but only where misrepresentations are made

concerning the value of consideration and damages can be determined "with

reasonable certainty."[77] As described above, only losses incurred in the purchase

or sale of securities may be considered when determining the existence and scale

of economic loss.

## C. Section 20(a) Claims

Section 20(a) of the Securities Exchange Act of 1934 creates a cause

of action against "control persons" of those engaged in the primary securities

fraud. The section provides:

> Every person who, directly or indirectly, controls any
> person liable under any provision of this chapter or of any
> rule or regulation thereunder shall also be liable jointly and
> severally with and to the same extent as such controlled
> person to any person to whom such controlled person is
> liable, unless the controlling person acted in good faith and
> did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.[78]

"The statutory language identifies two components to a control person claim: (1) a

primary violation by a controlled person; and (2) direct or indirect control of the

---

this question is "confided to the district court's broad discretion." *Id.*

[77]     *McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1050 (2d Cir.
1995).

[78]     15 U.S.C. § 78t(a).

primary violator by the defendant."[79] Primary liability by the controlling person is

not a necessary predicate to a section 20(a) claim, which is typically brought

against defendants who do not have primary liability.[80] Logically, if a court finds

that no primary violation occurred, judgment must be granted on the section 20(a)

claim as well.[81]

### D. Common Law Fraud

To recover damages for fraud under New York law, a plaintiff must

prove: (1) a misrepresentation or a material omission of fact which was false and

known to be false by defendant; (2) made for the purpose of inducing the other

party to rely upon it; (3) justifiable reliance of the other party on the

misrepresentation or material omission; and (4) injury.[82] "The claim also requires

a showing of proximate causation, such that the injury 'is the natural and probable

consequence of the defrauder's misrepresentation or . . . the defrauder ought

---

[79]     *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 414 (S.D.N.Y. 2003).

[80]     *See In re Initial Public Offering Sec. Litig.,* 241 F. Supp. 2d 281, 392 n.178 (S.D.N.Y. 2003) ("In that sense, Section 20 serves as a statutory form of respondeat superior.").

[81]     *See Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 148 Fed. App'x 66, 69 (2d Cir. 2005) (quoting *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)).

[82]     *See AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 208 (2d Cir. 2000).

20

reasonably to have foreseen that the injury was a probable consequence of his fraud.'"[83] Thus, the same elements are required of a securities fraud claim under New York law.[84]

### E. Corporate Standing to Sue

The Delaware General Corporation Law states, "If any [Delaware] corporation . . . neglects or refuses for 1 year to pay the State any franchise tax or taxes . . . the charter of the corporation shall be void, and all powers conferred by law upon the corporation are declared inoperative."[85] However – also by statute – "all corporations, whether they expire by their own limitation or are otherwise dissolved shall nevertheless be continued for the term of 3 years from such expiration or dissolution . . . for the purpose of prosecuting and defending suits."[86] Dissolution by gubernatorial proclamation as a result of failure to pay franchise

---

[83] *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 104-05 (2d Cir. 2001) (quoting *Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1044 (2d Cir. 1986)).

[84] *Cf. Dura,* 544 U.S. at 344 (noting "the common-law roots of the securities fraud action").

[85] Del. Code Ann. tit. 8, § 510.

[86] *Id.* § 278.

taxes "comes under the definition of 'otherwise dissolved.'"[87]

While the Delaware Supreme Court has stated that a corporation whose certificate of incorporation has been revoked "has lost any standing to appeal and be heard,"[88] a later decision of the Court of Chancery noted that this statement was unpublished, unsupported dicta that – if enforced – would represent a departure from longstanding principles of Delaware corporate law.[89] Therefore, Delaware law remains that "'a dissolved Delaware corporation has the power to close its affairs but not to carry on the business for which it was established.'"[90] As a result, a Delaware corporation may bring a lawsuit or counterclaim during the three-year statutory winding up period.[91] After that period, the corporation lacks

---

[87]    *United States v. McDonald & Eide, Inc.*, 670 F. Supp. 1226 (D. Del. 1987) (quoting *Harned v. Beacon Hill Real Estate Co.*, 80 A. 805, 808 (Del. Ch. 1911), *aff'd*, 84 A. 229 (Del. 1912)), *aff'd*, 865 F.2d 73 (3d Cir. 1989).

[88]    *Transpolymer Indus., Inc. v. Chapel Main Corp.*, No. 1990-284, 1990 WL 168276, at *1 (Del. Sept. 18, 1990).

[89]    *See First State Staffing Plus, Inc. v. Montgomery Mut. Ins. Co.*, No. Civ. A. 2100-S, 2005 WL 2173993, at *7 (Del. Ch. Sept. 6, 2005).

[90]    *Id.* (quoting *Gamble v. Penn Valley Crude Oil Co.*, 104 A.2d 257, 260 (Del. Ch. 1954)). *Accord Frederic G. Krapf & Son, Inc. v. Gorson*, 243 A.2d 713, 715 (Del. 1968); *Wax v. Riverview Cemetery Co.*, 24 A.2d 431, 435-36 (Del. Super. Ct. 1942).

[91]    *Cf. Smith-Johnson S.S. Corp. v. United States*, 231 F. Supp. 184, 186 (D. Del 1964) (limiting counterclaims in a suit concerning a dissolved corporation to three years after the date of dissolution).

both standing to sue and capacity to be sued.[92]

## F. Authentication of Documentary Evidence

Documentary evidence is subject to a "requirement of authentication or identification as a condition precedent to admissibility."[93] This requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."[94] "The party proffering the evidence bears the burden of proving 'a rational basis for concluding that an exhibit is what it is claimed to be.'"[95] "[T]here are few technical requirements" to authentication,[96] and district courts maintain "broad discretion" in determining whether authenticating evidence

---

[92] *See, e.g., Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760, 779-80 (Del. 2007).

[93] Fed. R. Evid. 901(a). *Accord United States v. Morrison*, 153 F.3d 34, 56 (2d Cir. 1998).

[94] Fed. R. Evid. 901(a). *See also United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001) (noting that the rule "does not erect a particularly high hurdle") (citation and quotations omitted).

[95] *United States v. Almonte*, 956 F.2d 27, 30 (2d Cir. 1992) (quoting *United States v. Hon*, 904 F.2d 803, 809 (2d Cir. 1990)). *Accord United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) ("[T]he standard for authentication, and hence admissibility, is one of reasonable likelihood.") (citation and quotations omitted).

[96] 5 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 9:2 (2008).

is sufficient.[97] Authentication is not only necessary for entry into evidence at trial; it is a precondition to consideration of documentary evidence on summary judgment.[98] A domestic business record of regularly conducted activity is only self-authenticating "if accompanied by a written declaration of its custodian or other qualified person" certifying the time of its creation, the source of the information contained in it, the manner in which it was kept, and the fact that it was created as a regular practice in the regular course of business.[99]

## IV. DISCUSSION

### A. Scotto's Loss and Reliance

Defendants' first claimed ground for summary judgment is that Scotto sustained no loss in his investment in Defense Tech.[100] Absent that crucial element, Scotto has no claim under section 10(b). As noted above, records produced in response to defendants' subpoenas show a net profit. Scotto presents two claims not accounted for in defendants' calculations: that he incurred losses in an additional account at LH Ross and that he loaned money to Defense Tech that

---

[97]     *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991).

[98]     *See, e.g., Commercial Data Servers, Inc. v. International Bus. Machines Corp.*, 262 F. Supp. 2d 50, 59-60 (S.D.N.Y. 2003).

[99]     Fed. R. Evid. 902(11).

[100]    *See* Def. Mem. at 10-15.

24

was never repaid.

In order for this Court to consider documentary evidence on this motion, it must be authenticated. The origins of the LH Ross statement are murky at best, and plaintiff's counsel is not "a witness with knowledge" who can authenticate a business record.[101] No evidence has been submitted to this Court that would create even a rational inference of authenticity. Nor does circumstantial evidence weigh in favor of the document's authenticity.[102] The document was produced by Scotto to promote his own case at the eleventh hour, and the content of the document – an annual trading summary that begins on November 1 rather than January 1 and uses Scotto's social security number as an account number – does not suggest reliability.[103] Finally, plaintiffs have not made the necessary submissions to render the LH Ross statement self-authenticating. Therefore, the LH Ross statement is inadmissable. Without this document, Scotto's statements at his deposition and in his affidavit concerning the purported

---

[101] Fed. R. Evid. 901(b)(1).

[102] *See John Paul Mitchell Sys. v. Quality King Distribs., Inc.*, 106 F. Supp. 2d 462, 472 (S.D.N.Y. 2000) ("[C]ircumstantial evidence may serve to demonstrate a document's authenticity.") (citing, inter alia, *United States v. Bagaric*, 706 F.2d 42, 67 (2d Cir. 1983)).

[103] *Cf. id.* (finding authenticity based on production by the opposing party and the contents of the document).

25

loss from his purported LH Ross account is inherently unreliable because some activities – such as the filing of a tax return, an application for a passport, or a trade through a brokerage account – require documentation.[104]

Similarly, Scotto's economic loss due to Defense Tech's failure to repay a loan to the company cannot be included in the calculation of his economic gain or loss. As described above, claims under section 10(b) must be based on economic loss due to the purchase or sale of a security. A loan to a corporation – even a corporation in which the creditor owns stock – is insufficiently connected to the securities market to be included as an economic loss in a section 10(b) claim.[105] Therefore, losses based on Defense Tech's failure to repay the loan cannot be included in the calculation of Scotto's economic loss as a matter of law.

Without these two claimed losses, Scotto has failed to create a genuine dispute of material fact concerning the absence of economic loss. Without economic loss, he has no claim under section 10(b). Therefore, defendants' motion for summary judgment is granted with respect to Scotto.

## B.    Jay Dees Inc.'s Reliance

---

[104]    *Cf. Jeffreys* 426 F.3d at 554 (noting that parties may not create a material dispute of fact based on "conclusory allegations or unsubstantiated speculation") (quoting *Fujitsu Ltd.*, 247 F.3d at 428).

[105]    *See Blue Chip Stamps*, 421 U.S. at 738.

Defendants' second asserted ground for summary judgment is that Jay Dees ceased to rely on defendants' misrepresentations or omissions after Catton signed the Verified Complaint.[106] Had the Verified Complaint detailed all of defendants misrepresentations and omissions – and had malfeasance ceased after that Complaint was signed – then Jay Dees's decision to continue to hold Defense Tech stock rather than to sell at a profit would constitute a second investment decision and would cut off loss causation.

However, upon review of the two documents, there can be no genuine dispute that the content of the Verified Complaint differs significantly from the content of the Complaint actually filed in this matter. This action extends far beyond the bare bones allegations of corporate mismanagement Catton signed nearly eighteen months before the commencement of this suit. Moreover, defendants fail to contest that additional misrepresentations were made to Catton to convince him not to file the Verified Complaint and to continue to have Jay Dees hold its shares in Defense Tech. Therefore, defendants' motion for summary judgment is denied with respect to Jay Dees Inc.

## C. Scheme of Conduct to Defraud Investors

Defendants also seek summary judgment against the two remaining

---

[106]    *See* Def. Mem. at 15-19.

named plaintiffs – Phillip Marks and Stephen Kevelson – based on the absence of reliance. Specifically, defendants assert that Marks and Kevelson did not rely on particular statements by Brady and that plaintiffs must establish "market manipulation" in order to avoid proof of direct conversations between a plaintiff and defendant.[107] Defendants are simply wrong. Kevelson and Marks have presented evidence that they relied on misrepresentations made either to Scotto[108] or to Kevelson's son.[109] These misrepresentations were then passed along to Marks and Kevelson, who relied on them in making investment decisions. As stated above, a valid section 10(b) claim may rely on misrepresentations made to third-parties with the requisite scienter, who then transmitted those statements to the plaintiff. This alone is sufficient to survive summary judgment.[110] Therefore,

---

[107]   *Id.* at 19-24.

[108]   *See* 6/22/07 Deposition of Phillip Marks, Ex. N to Barbaro Cert., at 150-151 (describing reliance of Scotto, who in turn had relied on defendants' misrepresentations).

[109]   *See* Pl. Opp. 56.1 ¶ 25. *Accord* 7/24/07 Deposition of Stephen Kevelson, Ex. N to Barbaro Cert., at 82-83 (describing material misrepresentations made by defendants upon which Kevelson relied in making investment decisions).

[110]   It is worth noting that not all of plaintiffs' reliance theories are correct. Plaintiffs' claim that they relied on the matched orders used to transfer Goodman's stock misses the mark. Although Brady did arrange a sale fitting the definition of a wash, there is no evidence that the sale was conducted "[f]or the purpose of creating a false or misleading appearance of active trading," 15 U.S.C. § 78i(a)(1). Rather, plaintiffs specifically assert that the sale was arranged in order

defendants' motion for summary judgment against Phillip Marks and Stephen Kevelson is denied.

## D. Defendants' Remaining Claims

The final aspect of defendants' motion seeks judgment on plaintiffs' remaining claims.[111] Specifically, defendants assert that plaintiffs cannot prevail on a claim of control person liability because there is no valid section 10(b) claim. As this Court has denied summary judgment on Jay Dees, Marks, and Kevelson's section 10(b) claims, their section 20(a) claims also survive.[112] However, since this Court has granted summary judgment on Scotto's section 10(b) claim, summary judgment is also granted on his section 20(a) claim.

Although defendants' arguments concerning state law claims are only asserted in a section heading in their brief and a single footnote, they nonetheless

---

for Brady to consolidate ownership of the stock, which he would later sell at an enormous profit. *See* Pl. Opp. Mem. at 15. Therefore, no misrepresentation affecting the market occurred with regard to this particular stock.

[111]   *See* Def. Mem. at 24-25.

[112]   Defendants also assert that "there is no credible evidence that [Brady] was in a position to exercise the kind of control require to establish controlling persons liability." This conclusory statement is unsupported by citation to law or fact. *Cf.* 1/7/08 Deposition of Frank Hariton, former attorney for Defense Tech, Ex. C to Barbaro Cert., at 19 (noting Brady's involvement in Defense Tech).

merit a brief discussion.[113] Defendants argue that the same grounds on which they

are entitled to judgment on the section 10(b) claims suffice to grant judgment on

the state fraud claims. Since the claims stand or fall together, Jay Dees, Marks,

and Kevelson's state law claims survive. However, Scotto has not demonstrated

that he has sustained damages, even if this Court were to include losses incurred

based on Defense Tech's failure to repay loans as harm caused by the

misrepresentations.[114] Therefore, defendants' motion for summary judgment on

plaintiffs' section 20(a) and state law claims is granted against Scotto and denied

against all other plaintiffs.

## E.    Defense Tech Counterclaims

Plaintiffs have also moved for summary judgment against the

counterclaims raised by Defense Tech. Specifically, plaintiffs assert that Defense

Tech does not have the power to bring counterclaims as a result of being void and

---

[113]    *Cf. City of Syracuse v. Onondaga County*, 464 F.3d 297 (2d Cir.
2006) ("Because the City touched upon its Rule 21 argument only in a heading
and footnote in its brief, it has waived any challenge to joinder based upon this
Rule.").

[114]    The loans totaled $115,000. *See* 11/21/06 Deposition of Dan
McPhee, Ex. E to Barbaro Cert., at 62. This does not sufficiently negate the more
than $600,000 profit shown by admissible evidence.

inoperative.[115]  However, while Defense Tech is void, it only became void on

March 1, 2007.  Defense Tech's counterclaims were brought on September 16,

2005,[116] while it remained in good standing.  The three-year wrapping-up period

does not end until March 1, 2010.  Thus, Defense Tech continues to have standing

to bring counterclaims against Scotto.  Plaintiffs' motion for summary judgment is

therefore denied.

## V.  CONCLUSION

For the foregoing reasons, defendants' motion is granted in part and

denied in part, and plaintiffs' cross-motion is denied.  The Clerk of the Court is

directed to close these motions (docket nos. 97, 98, 106, 109, and 114).  A

conference is scheduled for October 24, 2008, at 4:00 p.m.

---

[115]    *See* Memorandum of Law in Support of Plaintiffs' Cross-Motion for
Summary Judgment Against the Company at 1.

[116]    *See* Answer, Cross-Claim, and Counterclaim.

31

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           September 24, 2008

## - Appearances -

**For Plaintiffs:**

Richard Salvatore Ciacci, Esq.
Mathew E. Hoffman, Esq.
Nicole Barbaro, Esq.
Todtman, Nachamie, Spizz, & Johns, PC
425 Park Avenue
New York, New York 10022
(212) 754-9400

**For Defendants Defense Technology Systems, Inc. and Daniel McPhee**:

David Hirschberg, Esq.
Burkhart, Wexler & Hirschberg LLP
585 Stewart Avenue, Suite 750
Garden City, New York 11530
(516) 222-2230

**For Defendant John Brady:**

Eric S. Hutner, Esq.
Hutner Klarish, LLP
1359 Broadway, Suite 2001
New York, New York 10018
(212) 981-9121

**For Defendant Edward McPhee:**

Robert B. McKay, Esq.
Carney & McKay
1050 Franklin Ave., Suite 400
Garden City, New York 11530
(516) 742-6600